No. 18,455.

THE STATE OF KANSAS, *Appellee,* v. THE BLANCHARD CONSTRUCTION COMPANY et al. (THE MASSACHUSETTS BONDING AND INSURANCE COMPANY, *Appellant*).

SYLLABUS BY THE COURT.

1. INDEMNITY BOND — *Surety Company* — *Rules of Strict Construction—Not Applicable.* In an action upon a bond written by a corporation engaged in the business of furnishing surety for compensation the rules of strict construction which usually control in cases of accommodation sureties will not be applied, and if the bond is fairly open to two constructions, one of which will uphold and the other defeat the claim of the insured, that which is most favorable to the insured will be adopted. But where there is no ambiguity, the plain intention of the parties can not be disregarded or nullified by construction.

2. BUILDING CONTRACT — *Surety Bond* — *Terms and Provisions.* A contract entered into between the state of Kansas and a construction company for the erection of a building provided that the state architect should make a certified estimate each month of the value of all labor and material used that month in the construction, and that the state would pay to the contractor 90 per cent thereof; that no payments should be made except on his certificate that the work for which the payment was due had been properly done. A surety company guaranteed the faithful performance of the contract on the part of the construction company, and by reference the contract was

made a part of the bond. The bond also contained the following provision: "If payments are not made promptly in accordance to contract, this bond becomes null and void." During the progress of the work the construction company abandoned its contract, and the state had the work completed by another contractor. In an action on the bond it is held:

(a) That the rights of the parties are not affected by the fact that the architect was a state officer. In making the estimates he was not acting as state architect, but as an individual.

(b) The parties agreed upon the architect as the person upon whose judgment and decision with respect to the character, amount and value of the work payments were to be made. In the absence of fraud or mistake, they are bound by his judgment and decision.

(c) Upon the facts stated in the opinion, if the architect in making the certificates acted in good faith in relying upon information from others as to the extent of the work and the amount of labor and material that had been used, the terms of the contract in this respect were satisfied.

·(d) Some of the certificates were prepared by other persons, and were endorsed by the architect, "O. K." The employment of the abbreviation or symbol of "O. K." in such a transaction is in accordance with common usage, and was a sufficient certificate of the correctness of the estimate upon which it was endorsed.

(e) The state is not estopped from maintaining an action to recover upon the bond because before making the payments it failed to take the precaution to see that the estimates were true and correct, nor by the fact that the estimates certified by the architect included labor and material which had not in fact been used in the construction of the work, but which had been furnished when the estimates were made.

Appeal from Shawnee district court, division No. 1; ALSTON W. DANA, judge. Opinion filed December 6, 1913. Modified.

*Charles Blood Smith, W. S. McClintock, A. L. Quant,* all of Topeka, and *D. A. Murphy,* of Kansas City, Mo., for the appellant.

*John S. Dawson,* attorney-general, and *S. N. Hawkes,* assistant attorney-general, for the appellee.

## STATEMENT.

The Massachusetts Bonding and Insurance Company, a corporation engaged in writing surety bonds for compensation, appeals from a judgment against it in favor of the state of Kansas upon a surety bond by the terms of which the insurance company guaranteed the performance of a certain contract entered into between the Board of Regents of the Kansas State Agricultural College and the Blanchard Construction Company. In the contract the construction company agreed to erect a mechanical engineering building and to furnish therefor all labor and material, for the sum of $49,204. Among other provisions in the contract were the following:

"The State Architect shall, on or before the last day of each month, make an estimate of the value of all labor and materials used in the construction of said work by the party of the second part during the preceding month, and shall certify said estimate to the party of the first part, who will pay to the said party of the second part ninety per cent (90 per cent) of said value, and the balance remaining, after deducting the several payments from the above-mentioned sum, when said work has been completely finished, delivered and accepted by the Regents of the Kansas State Agricultural College and the State Architect.

"Provided, However, That no payment shall be made except on the certificate of the State Architect, or his successor, that the work for which said payment is due has been properly done."

The contract was dated July 1, 1908. The bond was executed immediately thereafter and guaranteed the faithful performance of the contract in accordance with the plans and specifications prepared by John F. Stanton, state architect. By reference the contract was made a part of the bond.

The construction company commenced work on the building, but in January, 1909, it abandoned the work

and shortly thereafter was adjudged a bankrupt. The board of regents thereupon entered into a contract with one Henry Bennett for the completion of the building.

The answer alleged that the board of regents violated the contract by paying to the construction company on five separate estimates 90 per cent of. the amount thereof without the estimates having been made by the state architect, and that these payments were largely in excess of 90 per cent of the value of the labor and material used in the construction of the work during each preceding month; that at the time the construction company abandoned the work and became bankrupt, the amount paid by the board of regents to the construction company was more than $5500 in excess of the value of the labor and material used in the construction of the work, and that by reason of these acts of the board of regents the defendant was discharged from all liability on the bond.

The case was tried to the court and separate findings of fact and conclusions of law were made. Among the findings of fact are the following:

"6. During the progress of the work five estimates were allowed. The first two were made by the State Architect, John F. Stanton, personally. The first of these bears date of September 18th, and the second October 7th, 1908.

"The remaining three estimates, which bear date of November 9th and December 9th, 1908, and January 5th, 1909, respectively, were made by The Blanchard Construction Company itself, at its office in Topeka, from data furnished by Mr. Sappington, its superintendent of construction, and from data originally in the possession of its officers at Topeka. These estimates were carefully reviewed by E. B. McCormick, a mechanical engineer, who was present at the work from day to day, and acting under the State Architect, and whose duties were to see that the specifications were fulfilled, and to assist the architect in preparing estimates and other work as carried on by

him in connection with the building. These last three estimates were prepared and handled in the following manner: The Blanchard Construction Company prepared statements of the items which they claimed should be included in the estimates. These statements were delivered by Mr. Sappington, superintendent of construction for The Blanchard Construction Company, to the said E. B. McCormick, who was a member of the faculty of the Agricultural College, and who was also superivising the work for the Regents. Mr. McCormick thereupon, upon the receipt of each of said statements, delivered the same to Mr. Seaton, his assistant. Mr. Seaton then took these statements, or estimates, and went over the work and checked the statements, or estimates, and returned them to Mr. McCormick. Mr. McCormick then approved them and sent them to the State Architect, John F. Stanton, at Topeka. Upon receipt of each estimate by the State Architect, John F. Stanton, at his office in Topeka, said Stanton verified the computations, and then wrote on the face of each estimate the words, 'O. K.,' and signed his name thereunto as State Architect. Thereupon said Stanton sent each estimate to the Regents at Manhattan by mail. By endorsement 'O. K.' Mr. Stanton meant to certify that the estimate was a correct value of the labor and material used in the construction of the work, and that the work was properly done.

"7. The Regents, upon the receipt of each estimate, paid The Blanchard Construction Company in accordance therewith.

"8. All of the estimates were made upon a sworn statement of Roy Sappington, the superintendent of construction of The Blanchard Construction Company, and contain an estimate of all items of material furnished and of labor done in the work, and were supported by Sappington's oath that the bill was just, correct and remained due and unpaid, and that the amounts claimed were actually due and according to law. They were also supported by the certificate of the president and secretary of the Board of Regents of the Agricultural College that the said statement was contracted for by the State Agricultural College under authority of law and that the amount therein claimed was correct according to such contract, and

The State v. Construction Co.

was unpaid. Written across each estimate so certified were the words, 'O. K.,' followed by the signature of John F. Stanton, State Architect. The Regents made payment in all cases upon such certificates, and the officers of the Blanchard Construction Company and the Board of Regents understood that when the State Architect signed his O. K. to these estimates that he meant to certify that they were the correct value of the labor and material used in the construction of the work, and that the work was properly done.

"9. In the first estimate, which bears date of September 18th, 1908, there was an allowance of $5,321.00 for the following items:

| | |
|---|---|
| Excavating | $591.00 |
| Cement, 750 bbls. | 1,312.50 |
| 150 loads of sand | 187.50 |
| 300 yds. of broken stone | 300.00 |
| 50 cords of rock | 150.00 |
| Structural iron | 25.00 |
| Dimension lumber | 2,500.00 |
| Nails | 30.00 |
| Carpenter labor | 135.00 |
| Brick | 90.00 |

"Only a limited portion of the material in the above estimate was actually in its place in the structure of the building on September 18th; but all of said material that was paid for under said estimate was, on said date, delivered upon the ground at the building site, except, perhaps, a portion of the broken stone which might have been at the quarry. . . .

"10. The second estimate, which bears date of October 7th, '08, was for $3,037.00, and contained the following items:

| | |
|---|---|
| Concrete | $1,811.50 |
| 100 cords of stone | 300.00 |
| 150 yards of sand | 188.50 |
| 1 car of cement | 262.00 |
| 1 car of lumber | 475.00 |

"With the exception of the item of concrete, only a limited portion of said material was actually in its place in the structure of the building, but all material paid for was delivered on the ground. Part of the stone was at the quarry, and part of it on the ground at the building site. The sand, cement and lumber were on the ground at the building site. The Board of Re-

gents paid The Blanchard Construction Company on this estimate $2,733.30."

In the third, fourth and fifth estimates the court finds that allowances were made for stone to the extent of several thousand dollars, a large part of which had never been used in the construction of the building, the allowance being for stone on the ground, at the building site, or at the quarry; that the quarries from which all the stone was obtained were on the college grounds belonging to the state, and the only allowance for stone in any of the estimates was for the work of quarrying and preparing the stone for use in the building; that the allowance of $3900 for dimension lumber was for lumber which was stacked on the ground, and part of which had been used in making concrete forms and in building the tool house, and in scaffolding.

There is a further finding that the Blanchard Construction Company erected a gas-producing plant and a gas holder for the college under a separate and distinct contract, at the price of $2241.80; that an item of $50 for tile drains, mentioned in the third estimate, was for material used in the construction of the gas plant and holder; that this material was originally delivered on the ground to be used in the engineering building, but, without the consent of the regents or the state architect, it was diverted by the willful act of an employee of the construction company; that from time to time sand that had been delivered for the engineering building was used in the construction of the gas-producing plant; but that it was replaced by other sand for which no additional estimate was allowed.

The court finds that the value of the labor and material used in the incompleted building at the time the contract was abandoned was about $10,000; but that the value of such labor and material at the time they were furnished, and when the estimates were made, was $16,618.53, which was the total amount of the five estimates. The consent of the bonding company was

not obtained to any of the payments made, nor to the manner of making estimates.

In March, 1909, the Blanchard Construction Company was adjudged a bankrupt. The trustee in bankruptcy claimed and was awarded by the referee a large part of the material which had been included in the estimates, but which had not been used. This material, which consisted mostly of the dimension lumber on the grounds, was sold by the trustee for $2600. After the contract was abandoned the regents entered into a contract with Henry Bennett, under which Bennett completed the building in accordance with the plans and specifications for $44,319.

The court found that the difference between the cost of construction under the original contract and the cost of completing the building under the Bennett contract, including interest, amounted to $15,346.33, and rendered judgment in favor of the state against the bonding company for that sum.

The opinion of the court was delivered by

PORTER, J.: It is conceded at the outset that the rules of strict construction which control in cases of accommodation sureties are no longer applied in the case of a bond written by a corporation engaged in the business of furnishing surety for compensation. (*Hull v. Bonding Co.*, 86 Kan. 342, 120 Pac. 544; *Medical Co. v. Hamm*, 89 Kan. 138, 130 Pac. 650; *The Y. M. C. A. v. Ritter*, 90 Kan. 332, 133 Pac. 894; *Guaranty Co. v. Pressed Brick Co.*, 191 U. S. 416, 24 Sup. Ct. Rep. 142, 48 L. Ed. 242; Note, 23 A. & E. Ann. Cas. 1085; Note, 33 L. R. A., n. s., 513), and that if a bond like the one sued on is fairly open to two constructions, one of which will uphold and the other defeat the claim of the insured, that which is most favorable to the insured will be adopted. But it is rightly contended that where there is no ambiguity, the plain intention of the parties can not be disregarded or nullified by construction.

6—91 KAN.

It is insisted by the defendant that none of the estimates were made in the manner provided by the contract; that the first two estimates violated the contract because they included material and labor that had not in fact been used in the construction of the work at the time the estimates were certified; that none of the other estimates was sufficient to authorize payments, because they were not made by Stanton, personally; that he placed his "O. K." upon them without any personal knowledge or information as to their correctness; and further, that they were insufficient for the reason that they likewise included many items for labor and material that had not been used in the construction of the work. Briefly summarized, the contention is that the state, having made these unauthorized payments in violation of the terms of the contract, the bonding company is discharged from any liability upon the bond.

It is said that "John F. Stanton was . . . elected to the important position of state architect . . . and the Bonding Company had a right to rely upon his ability and integrity to the end that the contractor should not receive more than he was entitled to under the contract." The rights of the parties to the contract are not affected by the fact that Stanton was a state officer. The state architect is appointed by the governor, but it is no part of his duties to act as umpire between the state and a contractor. The parties merely chose him as a suitable person upon whose certified estimates the payment should be made. They might have selected any other person or agency for the purpose. In making the estimates he was not acting as state architect, but merely as an individual.

Upon the findings of fact showing the manner in which the third, fourth and fifth estimates were made, it seems to us clear that they were the estimates of John F. Stanton, whether in certifying to their correctness he relied upon information obtained from other persons or acquired it in the first instance him-

self.  The contract did not in terms require him to see, personally, that the work was done or the material used.  The provision was that he should make an estimate of the labor and material.  If he acted in good faith in relying upon information from others as to the extent of the work and the amount of labor and material that had been used, and the Board of Regents in good faith made the payments, the terms of the contract were satisfied.

It is not claimed that there was actual fraud in the manner in which the estimates were made.  It is argued, however, that the including of items for labor and material that had not in fact been used in the construction when the estimates were certified amounted to a constructive fraud upon the bonding company.

The form in which the certificates were made was clearly sufficient.  The employment of the abbreviation or symbol of "O. K." in such transaction is in accordance with common usage, and its meaning was not misunderstood by any of the parties.

In *Lumber Co. v. Peterson & Sampson*, 124 Iowa, 599, 100 N. W. 550, payments were to be made to the contractor upon written certificates of the architect, based upon estimates made by him of the amount earned.  The supreme court of Iowa upheld payments of bills which were indorsed by the architect, "O. K." In the opinion it was said:

"Whether the architects' 'O. K.' indorsement of other bills for payments may fairly be held to be a compliance with the contract depends upon the meaning to be attached to that abbreviation or symbol.  . . .  As already remarked, the purpose of the certificate is to witness the fact that the sum named therein has been earned, and any form of written communication which conveys that information intelligibly and to the satisfaction of the parties should be held sufficient.  Now, 'O. K.' may have no title to be classed as 'elegant English,' but in the business life of this country it has for many years been in common use, and has acquired a meaning which is not at all obscure or uncertain.  Web-

ster's International Dictionary defines it as 'all correct.' The Century Dictionary gives its meaning as 'all right; correct; now commonly used as an indorsement, as on a bill.' It is neither more nor less than a brief, but expressive, certificate of the correctness of the bill or claim on which it is indorsed." (pp. 610, 611.)

The contract was made a part of the bond, and it is true the provision that no payment should be made except on the certificate of the architect that the work for which the payment was due had been properly done, like the provision for withholding 10 per cent as a final payment, was for the benefit not only of the original parties but the bonding company as well. (*The Y. M. C. A. v. Ritter*, 90 Kan. 332, 133 Pac. 894, and cases cited in the opinion.) But this brings us no nearer a solution of the real question as to the liability of the defendant upon the bond. The bonding company guaranteed the faithful performance of the contract on the part of the construction company. The latter did not faithfully perform. The bonding company therefore became liable for the damages sustained by the breach, unless, as defendant contends, the state is estopped from asserting the liability because it made payments for work and material that had not in fact been used in the construction of the work at the time. The contract, however, expressly provided that the state was to pay 90 per cent of each estimate when made by the architect. Is the state estopped then from maintaining this action because before making the payments it failed to take the precaution to see that the estimates were true and correct? We think there can be but one answer. The state purchased the bond for its protection, in order that the faithful performance of the contract might be guaranteed and the state be relieved from all obligations except to pay the 90 per cent when the certificates were made and the final payment when the work was completed.

All the parties to the contract agreed that when the estimates were made and certified the amounts due

thereon should be paid to the contractor. The bond provided that "if payments are not made promptly in accordance to contract, this bond becomes null and void." This clause was placed upon the face of the bond with a rubber stamp. The dispute as to whether it was stamped thereon at the instance of the state or the bonding company we regard as wholly immaterial. It was, however, to the interest of the surety that payments should be promptly made to the contractor to enable the latter to purchase labor and material and to carry out the contract; and the surety was obviously more interested in the ability of the construction company to perform its contract than was the state. Irrespective of these considerations, the state was obliged to make the payments promptly when the estimates were duly certified, unless it can be said that there was evidence or some finding of bad faith on its part in making the payments. Nothing in the evidence or in the court's findings indicates that the state acted otherwise than in good faith.

In *Smith v. Molleson,* 148 N. Y. 241, 42 N. E. 669, the contract required the estimate of the required " 'monthly payments not to exceed eighty per cent of the estimated value of the work *performed on the building.*' " (p. 247.) In an action on the bond one ground of defense was that the plaintiff had advanced to the contractors a larger portion of the contract price than he was required to by the contract because he had paid upon estimates based upon work done upon the granite at the quarry and at the place where it was dressed before it was actually set in place in the building. The surety was a private person, and under the rule of *strictissimi juris,* was not to be held beyond the precise stipulations of his contract. Nevertheless the court of appeals held that these payments did not constitute such a departure from the contract as to become available as a defense to the surety, and that the meaning of the contract should not turn on the use of the words

"on the building"; that the work on the building necessarily involved the preparation and carriage of the material, which were shown to be the most expensive part of the contract, and that the contract necessarily contemplated that the contractor would use the monthly payments for meeting these expenses, and would be practically unable to perform the contract if these payments were not made before the stone was actually set in the building. It was said in the opinion:

"The parties had the right to give to the expression, 'work performed on the building,' a broader meaning which could very properly include the value of any work done or materials procured under the contract towards its erection, although the granite procured and prepared had not yet been placed." (p. 248.)

In construing the contract the court took into consideration the situation of the parties, the nature of the work and other provisions of the instrument, and held that the intention was to make the advances as the work progressed. It was further said in the opinion:

"To give to it the other construction would, in practice, disable the contractors at the very outset from performance and impose upon the defendant a liability, inevitable from the beginning, and possibly in a much larger amount than has followed the construction adopted by the parties themselves." (p. 249.)

By the terms of the contract in this case the certificate of the architect was binding upon the original parties, and under the terms of the bond it became binding upon the surety. In the absence of fraud or mistake, the state was obliged to pay 90 per cent of the certified estimates. Neither fraud nor mistake is set up as a defense, and it is conclusively established by the evidence and findings that the plaintiff made the payments in good faith. The total amount of the five estimates was $16,618.53, and this the court finds was the value of the labor and material at the time they were furnished and when the estimates were made. The architect was agreed upon by the parties to the con-

tract as the person upon whose judgment and decision with respect to the character, amount and value of the work payments were to be made. In the absence of fraud or mistake they are bound by his judgment and decision. In *Board of Education v. Shaw*, 15 Kan. 33, it was ruled in the syllabus:

"Where the parties to a building contract agree upon an architect, and stipulate and agree to rely upon his judgment, skill and decision as to the character, amount and value of work to be done, they must abide ·by his judgment and decision, or impeach it upon the ground of fraud, mistake, undue influence, or some other good cause." (Syl. ¶ 2.)

Our conclusion is that the plaintiff is not estopped from maintaining this action because it made the payments upon the certified estimates of the architect; but it is manifestly unjust that the state should recover for the value of any labor or material included in the estimates which was thereafter diverted to the use of the state. It seems to be practically conceded that material of considerable value which was included in the certified estimates was used in the construction of the gas-producing plant and gas holder. Dimension lumber was used for concrete forms, and sand, cement and other material purchased for the mechanical engineering building were used in the construction of the gas-producing plant. There is a finding that the sand was replaced. We are unable to discover from the evidence or from the findings the value of the amount of labor and material included in the estimates which was thus diverted to the use of the state.

The judgment will therefore be modified and the cause remanded with directions to ascertain the aggregate value of all such items and to deduct the same from the amount of the judgment.