No. 45,516

O. K. JOHNSON ELECTRIC, INC., a Corporation, *Appellant*, v. HESS-MARTIN CORPORATION, INC., a Corporation, and THE TRAVELERS INDEMNITY CO., a Corporation, and WHITE LAKES DEVELOPMENT, INC., a Corporation, *Appellees*.

(464 P. 2d 206)

Opinion filed January 24, 1970.

*Gerald J. Letourneau,* of Topeka, argued the cause, and *Richard R. Funk,* of Topeka, was with him on the brief for the appellant.

*James D. Waugh,* of Topeka, argued the cause, and *Robert L. Webb, Ralph W. Oman, Philip E. Buzick, Wm. B. McElhenny, James L. Grimes, Donald J. Hortter, Terry L. Bullock,* and *Edwin L. Bailey,* of Topeka, were with him on the brief for appellee White Lakes Development, Inc.

*Floyd J. Gehrt* and *Robert L. Roberts,* of Topeka, were on the brief for appellees Hess-Martin Corporation, Inc. and The Travelers Indemnity Co.

The opinion of the court was delivered by

O'CONNOR, J.: This was an action instituted under the provisions of K. S. A. 60-1110 by O. K. Johnson Electric, Inc., a subcontractor, against Hess-Martin Corporation, Inc., the prime contractor, and its surety to recover for labor and materials furnished in the con-

struction of the White Lakes Shopping Center in Topeka. White Lakes Development, Inc., the owner of the shopping center, was made a third party defendant, and as a result of an indemnifying agreement with Hess, assumed the defense of the case. From an adverse judgment in the district court, Johnson has appealed.

For clarity, the parties will be referred to in the opinion as Johnson (appellant), Hess and White Lakes (appellees).

In the fall of 1963 Hess contracted with White Lakes to build the shopping center. On October 24, 1963, Johnson entered into a cost-plus contract with Hess for the installation of electrical systems in the new center.

The subcontract provided in part that Johnson was to be paid all of its "direct cost," plus 17% of the "direct cost," not to exceed $51,000. "Direct cost" was defined to include materials, labor and "payroll taxes and insurance, including workmen's compensation insurance and union fringe benefits. (14% of labor)." The "total direct cost" was to be determined upon completion of the contract and was *subject to the approval of Hess and the architect.*

Under the contract Hess agreed to make periodic payments to Johnson on or before the tenth of each month for all work done in the preceding month. Each monthly payment was to include Johnson's gross payroll for the month, as well as labor, fringe benefits, payroll taxes and insurance, in support of which Johnson agreed to submit notarized payroll reports. The monthly payment was also to include a portion of the fixed fee due Johnson, computed by allowing a factor of 17% of all direct cost for the preceding month. When a total of 80% of the fixed fee had been paid, no further payments thereon were to be made until the project was completed.

Other pertinent portions of the subcontract read:

"8. . . .

"C. . . .

"Upon receipt of written notice that the work is ready for final inspection and acceptance, the Architect shall promptly make an inspection, and when he finds the work acceptable under this Contract and the Contract fully performed he shall promptly issue a final certificate, over his own signature, stating that the work provided for in this Contract has been completed and is accepted by him under the terms and conditions thereof, and that the entire balance found to be due the [sub-] Contractor, and noted in said final certificate, is due and payable.

"Before issuance of final certificate the Sub-Contractor [Johnson] shall submit evidence satisfactory to the Architect that all payrolls, material bills, and other indebtedness connected with the work have been paid. "D. The Contractor [Hess] through his agreement with the owner agrees to pay all material invoices that have been approved by the Contractor and the architect as aforesaid and all applicable sales and use taxes. Said payments shall be made direct and the Sub-Contractor shall be furnished with a non-negotiable copy of each check covering such payments. The Sub-Contractor agrees that it will furnish all material invoices to the Contractor in ample time to take advantage of all cash discounts.

"9. The Sub-Contractor agrees to use the utmost diligence in buying material and shall use all leverage of his command to secure the lowest possible prices with good quality. Sub-Contractor agrees to furnish when requested by the Contractor, evidence that the prices paid for, or proposed to be paid for, materials purchased are the lowest reasonably to be expected compared to the current market prices for such materials.

"10. The Sub-Contractor agrees to supply all labor that shall be necessary from time to time to meet the Contractor's work schedule, but that *it will not use any labor in excess of the amount necessary to meet said schedule.* The Sub-Contractor agrees to comply with any reasonable requests of the Contractor regarding the amount of labor used from time to time in the performance of this contract." (Emphasis added.)

The work called for by the subcontract was performed by Johnson over a period of approximately one year. Upon completion of the job, including the corrections required by the architect to make the job satisfactory, Johnson was told by the architect a "certificate of acceptance" had been issued. Thereupon, Johnson submitted its final bill in the amount of $54,391.64.

Meanwhile, in January 1965, an audit was made by an accountant of all the billings for "direct cost" submitted by Johnson. The accountant determined that $13,696.23 of the billings constituted excess charges over Johnson's actual expenditures for payroll taxes, insurance, and union benefits. This came about because all of Johnson's billings had included a flat 14% for these items. No question had been raised on any of the billings previous to that time. After the audit Johnson, for the first time, realized that Hess and White Lakes were placing a different interpretation on the "14% of labor" clause in the contract. Finally, on March 30, 1965, Johnson was paid, and accepted, the sum of $39,750 without prejudice to any of the parties concerning the balance of its claim in the amount of $14,641.64.

This lawsuit was filed August 20, 1965. Johnson's claim was stated in two parts.

The first was for interest on various payments under the contract which were made later than the tenth of the month. Judgment was entered in favor of Johnson in the amount of $2,664.41 for the interest item, and no appeal has been taken from that portion of the judgment.

Johnson also claimed the $14,641.64 balance alleged to be due under the contract. Against this the appellees, Hess and White Lakes, asserted two defenses. A partial defense was that the "14% of labor" clause in the contract was ambiguous, and that Johnson was entitled only to *actual* taxes, insurance, and union fringe benefits instead of an arbitrary 14% of labor, which he had already been paid—a difference of $13,696.23. As to this defense, the trial court found that the contract was not ambiguous and that its express terms were controlling, regardless of the actual amount expended for these items. Appellees have not appealed from this ruling, and it is no longer an issue in the case.

The second defense, and the one with which we are concerned in this appeal, was that Johnson's "total direct cost" had not been approved by Hess or the architect, as required by the contract, and that such refusal was justified because Johnson had used labor in excess of that necessary in performing the job.

The case was tried to the court without a jury.

Mr. Johnson, in his testimony, acknowledged that from time to time he had received complaints from representatives of Hess and White Lakes about the electricians "loafing on the job." There were also some labor difficulties which resulted in work stoppages. Johnson testified about the problems incurred when he added or took off men at the request of the general contractor, but that he attempted to comply with all demands. Normally there were about 35 or 40 electricians working, but at one time there were nearly 90 on the job. He stated that generally production per man decreases as more men are put on the job. In response to complaints that some men were observed not working, Johnson explained that under union rules there must be one nonworking foreman for every four to eight electricians.

The appellees presented evidence that Hess refused to approve Johnson's claim for labor because the electrical end of the job did not progress as it should, and on parts of the job Johnson was using excess labor; that loafing by the electricians had been observed; and that Mr. Johnson had admitted his electricians had not been

operating at full efficiency. The architect, likewise, did not approve the claim for basically the same reasons as given by Hess. In the architect's opinion, Johnson had used over 10% more labor on the job than was necessary. There was other testimony corroborating that of loafing and inefficiency on the part of Johnson's employees, including statements to appellees' representatives by Mr. Johnson that his labor efficiency was 20% to 30% less than normal, and because of this the electrical subcontract had cost an additional 20% to 25%.

After noting the provisions of paragraph 10 of the subcontract relating to excess labor, the district court found:

"11. During the course of the construction, a controversy arose several times in regard to the quantity of work performed by plaintiff's workmen. In addition, more workmen were hired by plaintiff at the request of Hess Construction Co., Inc. in order to escalate the work under the prime contract. However, no formal action, other than several complaints, was taken by Hess Construction Company, Inc., in regard to the quantity of work performed by plaintiff's workmen, and plaintiff attempted to comply with all requests, in regard to quality and quantity of work, made by Hess Construction Co., Inc.

. . . . . . . . . . . . . . .

"13. The total direct cost incurred under said subcontract was not approved by Hess Construction Company, Inc., or the architects."

In its conclusions of law the court stated:

"3. The parties agreed under . . . the subcontract the total direct cost was subject to the approval of the contractor and the architects. This is binding upon the parties, unless it be shown there was fraud, bad faith or gross mistake in failure to approve said direct cost. The burden of proof is upon the plaintiff to establish this fact. It failed to do so.

"4. The Court finds plaintiff should take nothing upon his claim for work and labor done in the amount of $14,641.64, and judgment is hereby entered for defendants."

The nub of this case at trial centered on whether or not Johnson used excess labor in completing the job. This was an issue of fact, as shown in the pretrial order. No controversy existed about the work done by Johnson being acceptable or the job being completed according to plans and specifications.

Appellees sought to prove by their evidence that excess labor was used, and for that reason Hess and the architect refused to approve "total direct cost" as required by the subcontract. The finality of their refusal constitutes the crux of the appeal.

Appellees urge the trial court's conclusion of law No. 3 must be upheld because under the terms of the subcontract the decision of

the contractor and architect to withhold approval was binding, and Johnson did not establish any grounds for impeaching their decision. Johnson, on the other hand, challenges the trial court's conclusion on the basis the contract does not contain the requisite plain and express language to make the decision of the contractor and architect regarding "total direct cost" final and conclusive, therefore, the principle of law upon which the trial court decided the case was inapplicable. We believe Johnson's contention is sound, and reversal of the judgment is necessary.

In building and construction contracts the parties frequently agree that the finding of an architect or other designated person in respect to quantity and character of work done shall be conclusive, in which case it can only be impeached upon the ground of fraud, gross mistake, bad faith, undue influence, or some other good cause. (*Neale Construction Co. v. Topeka Township Sewer District No. 1,* 178 Kan. 359, 285 P. 2d 1086; *Wilson v. Drainage District,* 113 Kan. 82, 213 Pac. 635; *State v. Construction Co.,* 91 Kan. 74, 136 Pac. 905; *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520; *Board of Education v. Shaw,* 15 Kan. 33.) But the decision of the person designated on matters entrusted to him is deemed final and conclusive only where it appears from express terms of the contract, or from plain language therein, that the parties intended his decision have that effect. (*Mercantile Trust Co. v. Hensey,* 205 U. S. 298, 51 L. Ed. 811, 27 S. Ct. 535; *Wilson v. Drainage District,* supra; *State v. Construction Co.,* supra; *Flour Mills of America, Inc. v. American Steel Bldg. Co.* (Okla.), 449 P. 2d 861; *Delhi Pipeline Corporation v. Lewis, Inc.* (Tex.), 408 S. W. 2d 295; 13 Am. Jur. 2d, Building, Etc. Contracts § 34; 17A C. J. S., Contracts § 498 [8a]; Annos. 54 A. L. R. 1255, 110 A. L. R. 137; 3A Corbin on Contracts § 652.)

This court, in *Wilson v. Drainage District,* supra, was confronted with the following language in a contract for the construction of a ditch: " 'The engineer shall in all cases determine the quantities of the several kinds of work to be paid for under this contract, and he shall decide all questions as to lines, levels, etc.' " (p. 83.) At the trial of the case the district court directed a verdict for the plaintiff-contractor at the conclusion of all the evidence. There was testimony by two of defendant's witnesses that they had made measurements and calculated the amount of earth necessarily removed, which was substantially less than the engineer's estimate upon which plaintiff's claim was based. This court ordered a new

trial, stating the witnesses' testimony was sufficient to entitle the defendant to go to the jury upon the question of the quantity of earth excavated, inasmuch as the contract did not by express provision or plain language indicate an intention that the engineer's decision on the matter was final and conclusive.

*Halvorson v. Blue Mt. Prune Growers Co-op.*, 188 Ore. 661, 214 P. 2d 986, speaks in a similar vein. There, the terms of a contract authorized the architect to compute the proper value of alterations or changes in the work in the event that the parties could not agree upon such value, and to determine the amounts to be deducted from the contract price for defective work. The court said:

". . . As to these matters, his authority, under the contract, was to ascertain certain facts, and not to determine ultimate legal liability. An agreement giving that type of authority to an architect is to be classified as a limited arbitration agreement or limited appraisal agreement . . . The decisions of the architect under a limited arbitration agreement are not conclusive, unless the parties, in plain and unequivocal language, have made them so, which, as we have said, they have not done in the present instance. . . ." (p. 673.)

Nonetheless, just as in this case, the contention was also advanced that provisions of the contract had the effect of making the architect "the sole judge and arbiter," whose decisions were binding in the absence of fraud or mistake, but this argument was similarly rejected.

Appellees seek to sustain their position by relying on several cases where the decision of the architect as to certain matters was held to be binding on the parties, even though the contract did not specifically provide the decision would be final. (See, *State v. Construction Co.*, supra, and *Board of Education v. Shaw*, supra.) We think the cases are readily distinguishable because, unlike here, the plain language of the contract in each instance clearly manifested the intention of the parties that finality was contemplated.

The "subject to approval" clause now under consideration lacks plain and unequivocal language indicating a binding, conclusive effect was to be given any decision rendered by Hess and the architect. Although we are not called on to determine the conclusiveness of the architect's certificate of completion and acceptability under paragraph 8 C of the subcontract, we are by way of contrast impressed by the strength of the language there used indicating a clear intention by the parties that his decision (as sole arbiter) be regarded with an aura of finality.

Likewise, we find no express language conferring on the persons designated the broad power to decide all questions which may arise in regard to the fulfillment of the contract such as in *Neale Construction Co. v. Topeka Township Sewer District No. 1*, supra. The provision here limited the authorized action of the contractor and architect to the approval of "total direct cost," which was defined in paragraph 3 of the contract as including labor, material, and other items not here important. Even if their decision concerning the approval or disapproval of "total direct cost" could be considered final and conclusive, we have grave doubt that the "subject to approval" clause found in paragraph 2 of the contract contemplated the giving of the broad authority suggested for the contractor and architect to pass on any question relating to excess labor under paragraph 10. The "excess labor" provision contains no specific language to the effect that any issue of excess labor is to be determined by or is "subject to approval" of Hess and the architect in relation to their approval of "total direct cost." While in the exercise of their limited authority they may have discovered facts which in their opinions would substantiate a defense of excess labor, they lacked authority to make the ultimate legal determination of liability arising from that phase of the contract. The decision of the architect, or other designated person, cannot be considered binding and conclusive when it concerns a matter not contemplated by the contract. In other words, the subject matter which the third person is empowered to decide is limited by the terms of the contract. (*Shine v. Hagemeister Realty Co.*, 169 Wis. 343, 172 N. W. 750; *Gerisch v. Herold*, 82 N. J. L. 605, 83 Atl. 892; *Boston Store v. Schleuter*, 88 Ark. 213, 114 S. W. 242.)

A further indication that the parties themselves never intended the decision of the contractor and architect to be final and conclusive is that "total direct cost" was to be approved by two designated persons, one of whom was a party to the contract. Had Hess and the architect disagreed between themselves on whether to approve or disapprove "total direct cost," an impasse would have resulted. The possibility of such a result demonstrates the parties did not contemplate that any decision of Hess and the architect be taken as correct and binding.

This is not the ordinary situation where in clear and unequivocal language a designated third person or group of persons is constituted the "sole arbiter" of specified matters or disputes arising out

of a contract, and whose decision is deemed conclusive in the absence of proof of fraud, gross mistake, or other good cause. For Hess to now maintain it occupied the role of an arbitrator under the terms of this contract is difficult for us to comprehend. The "subject to approval" clause was undoubtedly inserted to insure that labor actually performed by Johnson and its employees went into the job and was in accordance with the plans and specifications. Although the architect was obviously in the best position to make this determination, nevertheless any decision by him was also subject to Hess' approval. The subcontract required Johnson to submit notarized payroll reports in order to receive monthly payments from Hess. In addition, Johnson was to submit satisfactory evidence that all payrolls, material bills, and other indebtedness connected with the work had been paid before the architect issued his final certificate. Regardless of what action the architect took in respect to labor costs, Hess could still raise a question of excess labor and refuse payment, in which case its decision would bear no greater finality than that of any other party to the contract.

For the reasons discussed, we conclude that Hess' refusal to approve Johnson's direct cost, as well as the refusal of the architect, is entitled to no more weight than the refusal of a party to pay according to the terms of a contract because the other party has breached a particular provision thereof.

For disposition of this case Johnson urges that it is entitled to judgment because finding No. 11 by the trial court resolved the question of excess labor in Johnson's favor. We cannot agree. The finding, in our opinion, is vague and inconclusive; the issue remains undetermined. Since the trial court erroneously decided the case on the theory that the decision of Hess and the architect was binding and had not been impeached, a new trial must be had on the issue of excess labor.

Accordingly, the judgment of the district court is reversed with directions to grant a new trial.