No. 46,132

ELBURN G. THOMAS, *Appellee,* v. ELSIE DUDREY and W. H. DUDREY, *Appellants,* and IVAN A. ODEN, *Appellee.*

(494 P. 2d 1039)

Opinion filed March 4, 1972.

*Paul R. Wunsch,* of Kingman, argued the cause, and *Evart Garvin,* of St. John, was with him on the brief for the appellants.

*Jerry M. Ward,* of Great Bend, argued the cause, and *Tudor W. Hampton* and *Thomas J. Berscheidt,* both of Great Bend, were with him on the brief for the appellee, Elburn G. Thomas.

*Robert P. Keenan,* of Great Bend, was on the brief for Ivan A. Oden, appellee.

The opinion of the court was delivered by

FROMME, J.: This action was brought to recover damages for the violation of the rights of a tenant-operator of land under a conservation reserve contract. The trial court entered judgment in

favor of the tenant-operator against the purchaser of the land and her husband. The husband had been substituted as tenant-operator in a revised contract in place of the plaintiff.

Some background facts are necessary.

In 1949 Ruth Oden, a non-resident, owned the NW ¼ of Section 2, Township 24, Range 14, in Stafford County, Kansas. She leased the land for two years to the plaintiff, Elburn G. Thomas, under the ordinary crop share lease for one-third of all crops raised on the premises. Thereafter the plaintiff continued in possession of this land through 1959 as an ordinary farm tenant without any written renewal lease.

In 1960 the parties placed the land in the "soil bank" by making application and by executing a ten year conservation reserve contract with the secretary of agriculture. The plaintiff cultivated and seeded the land to grass and performed such maintenance and weed control as was required by the contract. The annual soil bank payment of $2,119.00 was to be shared equally during the term of the contract.

Ruth Oden died and a revised or modified contract was executed on November 16, 1960, by her administrator, the plaintiff and the secretary of agriculture. This contract covered the same period as the previous contract, ending in 1969, and contained the same terms and conditions as before.

After the estate of Ruth Oden was settled, her son, Ivan A. Oden, became the new owner and he entered into another revised contract on October 31, 1962. The contract was signed by Ivan A. Oden, the plaintiff and a member of the county committee for the secretary of agriculture. It covered the same period, ending in 1969, and contained the same terms and conditions as before.

In 1966 the land was sold. The agreement to sell was between Ivan A. Oden and W. H. Dudrey. The deed, executed and delivered under the contract, named the wife of W. H. Dudrey as grantee. The land was transferred subject to the rights of the agricultural tenant and the deed mentioned that the premises were under contract in the conservation reserve program.

Thereafter W. H. Dudrey and Elsie Dudrey, his wife, succeeded in obtaining a revised soil bank contract for the balance of the original ten year term which eliminated the plaintiff as tenant-operator. For the balance of the term W. H. Dudrey as tenant-operator and Elsie Dudrey as owner received the entire amount of the soil bank payments. The change was made July 31, 1966.

This change in the tenant-operator was protested by plaintiff to the county committee on August 15, 1966. His protest was based upon a claimed right to continue as tenant-operator for the entire ten year period ending in 1969, under the prior soil bank agreements with Ruth Oden and Ivan A. Oden. He asserted the change of tenant was not bona fide, that the title of the real estate was placed in the wife's name by W. H. Dudrey so that W. H. Dudrey might take over the plaintiff's rights as tenant-operator. Plaintiff further asserted that the land was purchased and sold subject to his rights under the conservation reserve contract and that the Dudreys violated his rights by obtaining the revised soil bank contract for the balance of the ten year term.

Plaintiff first pursued his administrative remedies. Review of the action of the county committee was sought on both the state and the federal levels. These attempts to require the county committee to recognize him as the rightful tenant-operator in place of W. H. Dudrey were unsuccessful. The state office ruled that any question as to the private rights of plaintiff and W. H. Dudrey "is determinable under applicable state law and the circumstances of the particular case." In Washington, D. C. the acting deputy administrator of state and county affairs refused to enter the controversy. In a letter, otherwise ambiguous, he stated the matter "is a question between him [Thomas] and the landlord [Dudrey] to be resolved by the Kansas courts."

Plaintiff then brought the present action to recover damages from the Dudreys in the amount of the tenant-operator's share of the annual soil bank payments received by them from 1966 to the end of the contract period in 1969.

The action was tried before the district court without a jury. Judgment was entered in favor of plaintiff and against the defendants, Elsie Dudrey and W. H. Dudrey. The Dudreys have appealed.

Although appellants set forth in the record 14 separate alleged errors in their statement of points their argument in the brief is not separated or directed toward these 14 alleged errors. Those points neither briefed nor argued on appeal will be deemed abandoned. (*State, ex rel., v. Doerschlag,* 197 Kan. 302, 304, 416 P. 2d 257.)

The questions to be answered in this appeal are set out by the appellants in their brief as follows:

"The questions presented in this case are: Did Thomas have any rights in and to any soil bank payments under the Soil Bank Contract in question after the sale of this property by Mr. Oden to Elsie Dudrey, the termination of such contract by the Stafford County A. S. C. Committee, and the approval by the County Comittee of W. H. Dudrey as operator of this land? If Thomas had any such rights, then the further question arises: Do such rights give rise to a cause of action in his favor against the Dudreys, or either of them, or must he pursue his remedy against the U. S. Department of Agriculture?"

The trial court made comprehensive findings of fact and conclusions of law. Pertinent portions of these findings and conclusions are as follows:

". . . Both W. H. and Elsie Dudrey knew that plaintiff was the tenant in possession under this program. Before the deed was executed, both W. H. and Elsie Dudrey conferred about plaintiff's status. They believed that plaintiff could be removed as tenant without incurring any liability to him. They believed the record title owner could not be the tenant under this program.

"The purchase of this land was a joint venture of W. H. and Elsie Dudrey. The written contract to purchase was in favor of W. H. alone. . . .

". . . In any event, the conviction that they could substitute W. H. Dudrey for the plaintiff as soil bank tenant was a consideration that entered into the final determination of the Dudreys to take the land in the name of Mrs. Dudrey. This finding is legally permissible since the trier of fact is permitted to use that knowledge common to men in general. In this connection, all of the circumstances indicate that the Dudreys were guided by a desire to secure the tenant's soil bank payments for themselves, a trait common to man, the desire for financial gain. . . .

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Throughout, the sale proceedings, Mr. Oden advised the County Committee and the Dudreys that plaintiff had tenancy rights under this program in an attempt to protect plaintiff's interest for the full ten-year period. This included putting a provision in both the contract and deed which stated that the sale was subject to the rights of tenancy under the Soil Bank Program. He, as well as his mother, fully intended plaintiff should have tenancy throughout the ten-year term.

.  .  .  .  .  .  .  .  .  .  .  .  .  .

"Plaintiff performed all of his obligations relative to compliance with the Soil Bank Program up until the time he was advised by the County Committee that they would not recognize him as tenant after 1966 but would so recognize W. H. Dudrey. The work done by or on behalf of W. H. Dudrey as tenant in the years 1967 through 1969 was minimal as grass cover was by then well established. It consisted chiefly, if not entirely, of a small amount of weed control around the boundary of the land. No evidence was offered as to the value of this work."

The trial court further concluded:

"Applying Kansas law relating to landlords and tenants, the factual finding made herein would indicate the following as proper legal conclusions:

"1. At the time Mrs. Oden and plaintiff agreed to put this land in the soil bank program, plaintiff was a year-to-year tenant as a permissive holdover under an earlier-written lease.

"2. Upon the execution of the papers for the program by Mrs. Oden and the plaintiff, plaintiff became a tenant for a ten-year period to begin January 1, 1960, and to terminate by its terms on December 31, 1969.

"3. In addition to the general considerations that are common to landlord-tenant relationships, there were considerations introduced at the time of entering the program which were changes from pre-existing considerations and which furnished adequate legal considerations between the parties. Chief among these were the landowner's grant of possession for a ten-year period, the modification of remuneration to equal shares, and the obligation of the tenant to do the extra beginning work to establish grass cover.

"4. The tenancy is legally valid as against any claim of not satisfying the Statute of Frauds. The agreement was followed by almost seven years of performance thereunder. The signing of the various forms necessary to obtain acceptance in the program constituted a legally sufficient 'writing.'

"5. Plaintiff was a tenant in possession at the time the purchase was made by the Dudreys. They were chargeable with notice as to his rights. They actually knew he was a tenant. They were obliged to discharge any rights he had whether they did or did not know the extent of those rights. Since they were obliged to ascertain the quality and quantity of his tenancy, they could not evade this obligation by accepting the unauthorized legal advice given by Mr. Barker. They breached this obligation when they secured tenancy payments for Mr. Dudrey for the years 1967, 1968 and 1969."

On the basis of the record presented on appeal these findings are supported by the evidence. It likewise appears that the trial court's findings justified its conclusions.

Appellant quarrels with certain findings of the trial court quoting statements made by W. H. and Elsie Dudrey in discovery depositions concerning their joint acquisition of the land. These depositions are not included in the record and it does not appear from the record they were ever introduced in evidence. The statements were included by the trial court to corroborate other evidence which adequately supported the material findings of the court and no prejudicial error resulted even though we assume they were improperly considered by the trial court.

Some question is raised by appellants in their brief as to the taxing of costs of the depositions. This was not included in their statement of points. Matters not included in the statement of points will not be considered on appeal. (*Shinkle v. State Highway Commission*, 202 Kan. 311, Syl. ¶ 3, 448 P. 2d 12.)

The federal law on conservation reserve contracts states:

"In the formulation and administration of programs under this chapter, the Secretary shall provide adequate safeguards to protect the interests of tenants

and sharecroppers, including provision for sharing, on a fair and equitable basis, in payments or compensation under this chapter, and including such provision as may be necessary to prevent them from being forced off the farm. . . ." (7 U. S. C. A. § 1810.)

The Dudrey's, after purchasing this land subject to plaintiff's rights, in violation of their agreement with Ivan A. Oden were able to squeeze plaintiff off the land with the aid of the county committee. This kind of scheme is frowned on in *Caulfield v. U. S. Department of Agriculture,* 293 F. 2d 217, where it is said:

"Indeed, the legislative history supports the view that in effectuating the vigorous policy against the use of any devious schemes by landowners as a means of discriminating against tenants Congress looked to the County Committees as the means of positive enforcement." (p. 220)

The appellants here rely heavily upon the conclusiveness of the action of the county committee in recognizing W. H. Dudrey as the tenant-operator for the balance of the term of the revised soil bank contract. It should be noted that their function is not judicial. They have no jurisdiction to determine the rights of private parties arising from the purchase and sale of Kansas real estate. This fact was recognized on both the state and federal levels when the action of the county committee was submitted for review through the administrative processes.

The appellants argue that plaintiff's rights, which he pursues in this action, are dependent upon the continuance of his status as a holdover tenant under the written agricultural lease executed between Ruth Oden and plaintiff in 1949. Plaintiff's claim is not based upon any rights as a holdover tenant. His present claim arose by reason of the original conservation reserve contract and the rights in the subsequent revised contracts which were reserved to him when Ivan A. Oden sold the land to the Dudreys subject to his rights.

Testimony of the employees in the Stafford County ASCS office indicates that the four contracts were continuations under the original application executed by Ruth Oden and plaintiff in 1960. They were considered revised contracts. At the time the Dudreys purchased the land in 1966, the Soil Bank Program had terminated and new soil bank contracts could not be intiated by applications. The only contractual matters then permitted were those that related to continuance or modification of existing contracts.

The revised conservation reserve contract was a complete written agreement. It provided in part as follows:

"The undersigned producers hereby agree to the terms and conditions of this contract and certify that all of the producers having any control of the farm during the entire contract period and all of the producers who are entitled to payment under this contract are shown in this Part III, or on the continuation sheet attached hereto, and each undersigned producer certifies that he has not entered into conservation reserve contracts, including this contract, under which the aggregate of his shares of the annual payments for any year for all farms in which he has an interest will exceed $5,000.00."

The agreement covered the NW ¼ of Section 2, Township 24, Range 14. The contract period was stated to begin in 1960 and to continue through 1969. The annual payment of $2,119.00 was to be paid during this period, one-half to Elburn G. Thomas and one-half to Ivan A. Oden. As hereinafter pointed out certain land practices were required to earn the payments. The agreement was signed by an ASC county committeeman and by Mr. Thomas and Mr. Oden. This contract did not refer to any farm lease between Thomas and Oden and was in no way dependent upon such a lease.

In 1959 the farm lease between plaintiff and Ruth E. Oden had spent its force. It was not renewed after the first conservation reserve contract was entered into. It could not have been continued because such would have violated the terms of the conservation reserve contract. The former farm lease and the contract covered only one quarter of land. The farm lease required crops to be planted on the land by plaintiff and crops were to be shared on a one-third rental basis. The contract with the secretary of agriculture required both the landlord and tenant to take the land out of production. No crops could be grown on the land.

Termination and surrender of a farm lease may be either by agreement of the parties or by operation of law. (*Christenson v. Ohrman,* 159 Kan. 565, 156 P. 2d 848.) Here the lease was terminated by the new agreement of the parties.

A tenant from year to year holds over with the assent of the landlord under the same terms and conditions as stated in the original lease. (*Martin v. Hamersky,* 63 Kan. 360, 65 Pac. 637; see also 49 A. L. R. 2d, p. 480.) In the present case after the landlord and tenant had signed the conservation reserve contract the holdover tenancy was terminated. The new agreement required plaintiff to establish a grass cover on the land by seeding. He was obligated to protect the land and control weeds. In return it was agreed he was to receive fifty percent of the cash soil bank payment over a period of ten years.

When a third conservation reserve contract was signed two persons held rights in this land. They were Mr. Oden and Mr. Thomas. Oden held legal title. Thomas was in possession and was obligated to care for the land. The contract created certain rights and obligations. So long as they kept the land in compliance with the terms of the agreement they were to receive annual payments during the terms of the contract ending in 1969.

When W. H. Dudrey contracted to purchase this quarter of land from Ivan A. Oden in 1966, he agreed as follows:

"It is understood and agreed that the aforesaid Real Estate is presently in the Conservation Reserve Program."

No attempt was made by him to purchase or acquire the rights of plaintiff Thomas in this land. When the purchase was completed W. H. Dudrey took the deed in the name of Elsie Dudrey, his wife. The deed contained the following reservation or exception inserted below the description of the land in the granting clause:

"Subject also to the rights of the agricultural tenant, said premises now being under contract in the Conservation Reserve Program of the United States Department of Agriculture."

Further on in the habendum clause of this deed appeared the following:

". . . [T]hat the same are free, clear, discharged and unincumbered of and from all former and other grants, titles, charges, estates, judgements, taxes, assessments and incumbrances, of what nature or kind soever: except easements, if any, of record, and *rights of agricultural tenant—* . . ." (Emphasis added.)

The conservation reserve contract which assured the plaintiff of his rights as tenant-operator was on file as a public record in the ASC office of the county. The purchaser had notice of these rights. Under both the contract of purchase and the deed the property was sold subject to the rights of the plaintiff created by the conservation reserve contract. The rights of the tenant-operator were recognized and the Dudreys took title to the land subject to those rights. The Dudreys merely stepped into the shoes of the former owner, Ivan A. Oden.

When property is sold subject to contractual obligations arising from a soil bank contract, such burdens follow and attach to the title of the purchaser.

In *Murfin Drilling Co. v. Poe,* 191 Kan. 637, 383 P. 2d 972, this court said:

". . . When property is sold subject to encumbrances and contractual obligations, such burdens follow and attach to the title of the purchaser. . . ." (p. 640)

In *Dillon Investment Co. v. Kinikin,* 172 Kan. 523, 241 P. 2d 493, this court said:

". . . [T]he plaintiff accepted a deed in which validity of the exceptions and reservations as to a right of way were recognized and made part and parcel of it. Under the circumstances the grantee, appellee herein, is estopped to question validity of the exceptions and reservations. . . ." (p. 528)

The appellants lay much stress on provision 8 (*b*) of the conservation reserve contract relating to loss of control of the farm by sale, death or otherwise.

Section 8 (*b*) reads as follows:

"The loss of control of all or part of the farm by sale, death, or otherwise (a lease shall not be considered a loss of control) shall terminate the contract with respect to the acreage over which control is lost. In the event of such termination, unless the land is continued in the Conservation Reserve Program under the conditions specified in the Regulations, Federal cost-shares paid or payable with respect to the acreage over which control is lost shall be forfeited or refunded. In such case, each contract signer shall not only be obligated to refund all Federal cost-shares received by him but shall also be jointly and severally obligated with the other contract signers to refund all Federal cost-shares received by any person with respect to such acreage under this contract or any previous contract."

It should be noted that plaintiff retained control of the farm as tenant-operator after the death of Ruth Oden and when the land was acquired by Ivan A. Oden. In both instances the ten year contract was not terminated for revised contracts were recognized by the county committee.

Under the conservation reserve contract it is the "loss of control of the land" which terminates the contract, not the death or the sale. The plaintiff's control of the land as an agricultural tenant was retained, not lost, when this land was sold to the Dudreys. It is true that the seller Ivan A. Oden lost control of his rights by the sale. The rights passed to the Dudreys. It possibly lay in the Dudreys' power under other provisions of the conservation reserve contract to have terminated the contract with the secretary of agriculture and in such case the tenant and Ivan A. Oden, as former producers, might have been required to refund to the secretary all cost-shares paid by the government.

But this was not the case here for the purchasers continued the land in the conservation reserve program under a revised contract,

and by the simple ruse of taking title to the land in the wife's name and notifying the ASC committee that the husband was the new agricultural tenant they obtained the operator's and the owner's share of the annual $2,119.000 payment. This violated both the purpose and spirit of the soil bank program. This further violated the terms of the sale by which the Dudreys acquired title.

The rights of a tenant-operator under a soil bank contract may be effectively reserved to him in a deed of conveyance by the owner of the land, and purchasers who accept a deed to the land subject to the rights of the tenant have a duty to the tenant to honor his rights if a revised soil bank contract is issued.

The soil bank payments due the operator were wrongfully obtained by the Dudreys and suit was properly brought to recover the same from them. Plaintiff performed all necessary obligations to comply with the soil bank program up until the time he was forced out by the actions of W. H. Dudrey and of the county committee. There was no evidence of the value of any work performed by W. H. Dudrey on the land to keep the land in compliance. His work was minimal at most, for a grass cover had been previously established on the land at the expense of and by the labors of the plaintiff.

The appellants cite the regulations and soil bank law at length in support of the authority of the local county committee to accept W. H. Dudrey as the new tenant-operator. Its authority can no longer be questioned. But the right or the wrong of the committee's action is not subject of plaintiff's lawsuit. Plaintiff is suing Dudrey for wrongfully violating a duty which Dudrey assumed when he purchased the land.

Although a tenant-operator under the Soil Bank Program (7 U. S. C. A. § 1801 *et seq.*) may be precluded from pursuing a judicial remedy against the officials who administer the soil bank act, yet a judicial remedy remains available in the state courts against a landlord or a purchaser for violation of a legal duty owed to the tenant.

Two federal circuit court cases, *Dickson v. Edwards*, 293 F. 2d 211 and *Caulfield v. U. S. Department of Agriculture*, supra, fully support the jurisdiction of this court to decide the claims of private parties arising from a violation of duties and obligations under contracts executed by them.

It was pointed out in *Caulfield* a tenant has only limited rights in obtaining a judicial review of an administrative determination

under the Soil Bank Act. Federal courts have no jurisdiction of a tenant's action to review an administrative determination that the landlord had not violated the Act in the manner of securing an acreage reserve contract.

However, it is crystal clear from the opinion in *Caulfield* that although the tenant may be precluded from pursuing a judicial remedy against the officials who administer the Act, yet a judicial remedy remains available against the landlord or a purchaser for violation of a legal duty owed to the tenant.

In *Dickson* this was pointed out by the following paragraph:

"While we therefore fully approve the District Court's holding that this was not a termination because of an asserted *violation* and accordingly beyond the power of the District Court to adjudicate, we wish to make doubly clear that nothing said or unsaid is to be understood as an approval or disapproval by us of the propriety of the action of the County Committee, the State Committee, the Secretary, the Landowner or the new Tenants. The rights under the law of Texas between Dickson and the Landowner or between him and the successor Tenants with respect to Soil Bank payments received in 1958 and subsequent years are matters for subsequent adjudication in Texas courts. Such matters were not before the District Court nor are they before us." (293 F. 2d 211, 215)

It may be noted in passing that the federal court in *Dickson* was confronted with a claim somewhat similar to the one in the present case. It held the federal court was without jurisdiction and that the claim was one for the state courts to resolve.

The appellants quote from and rely on *Hill v. Schuhart*, 391 S. W. 2d 579 (Tex. Civ. App.) for language to support their argument. The case is factually dissimilar to the present case. It was decided upon the basis of the laws of Texas and is not controlling here.

In this Texas case the tenant Hill had leased the farm on a yearly basis. The farm was placed under a soil bank contract. The owner then died. Hill's annual lease expired. The new owner, a Mrs. Steele, apparently inherited the farm. She evicted Hill and leased the farm to Schuhart who was recognized by the county committee as the tenant-operator. Hill then sued Schuhart to recover the 1963-64-65 soil bank payments from him. The Texas court held that Hill had no enforceable rights against Schuhart for the only lease Hill had on the land had terminated. It is apparent that the owner Steele did not acquire the land with any reservation of rights in favor of Hill. Therefore she violated no duty or obliga-

tion to Hill when she leased the farm to Schuhart. It was clear that Hill had no cause of action against Schuhart. The case is not persuasive for it is factually dissimilar.

In the present case plaintiff's rights in the soil bank contract were recognized by the Dudreys when they purchased the land subject to those rights. Plaintiff's cause of action for damages is based upon the obligation placed upon the Dudreys by the contract of sale and the deed from Ivan A. Oden. The Dudreys intentionally violated a duty owed to plaintiff. Plaintiff was damaged thereby and the amount of his damages was correctly determined by the trial court.

Other contentions are advanced by appellants on appeal. Some of these were not included in their statement of points. As to the others it has not been made to appear that prejudicial error resulted therefrom.

The judgment is affirmed.

O'CONNOR and PRAGER, JJ., not participating.

FATZER, C. J., dissenting: I must respectfully dissent from the court's affirmance of the judgment below. The court's opinion affirms the judgment upon an issue that was not stated or briefed by the appellee. As hereafter noted, the court concludes that Thomas is suing the defendants for breach of a duty Mrs. Dudrey assumed when she purchased the quarter section in 1966. In my judgment, the court's opinion does not correctly construe or apply the Soil Bank Act (7 U. S. C. A. 1801, *et seq.*), the Regulations of the Secretary of Agriculture, the terms and provisions of the Conservation Reserve Contracts, and the findings of the County Committee and the State Committee upon Thomas' application for administrative relief. In addition, the court's opinion erroneously concludes a Conservation Reserve Contract creates rights in land for the benefit of the *tenant-operator* for the full duration of a ten-year contract, which may be enforced against a purchaser who takes title to the land subject "to the rights of the *agricultural tenant.*"

While the court's opinion makes a statement of the facts in a general way, I deem it necessary to more fully elaborate the facts of this case which are not in dispute. Those pertinent follow:

The plaintiff is a farmer and has resided in Stafford County since 1943. He was the farm tenant of Mrs. Ruth E. Oden, who owned the quarter section of real estate involved. In 1949 Ruth Oden and the

plaintiff entered into a written agricultural lease covering the quarter section. The lease was for a two-year period commencing August 1, 1949, and terminating August 1, 1951. The farm tenancy agreement provided for division of the crops, ⅖ to Mrs. Oden, as owner, and ⅗ to the plaintiff, as tenant. No further written leases were executed between the parties, but the plaintiff, as tenant, continued in possession and control of the property until August 1, 1966, as farm tenant from year to year under Kansas law, as hereafter detailed.

The plaintiff and Mrs. Oden became aware of the Conservation Reserve Program (Soil Bank Program) in 1959, when it was first inaugurated. After discussion of the productivity of the farm, the parties agreed to make application to the County Committee for a Conservation Reserve Contract. On November 12, 1959, Ruth Oden, as owner, and the plaintiff, as operator, entered into a Contract with the County Committee to seed the quarter section to a permanent grass cover pursuant to the Soil Bank Program enacted by Congress and regulations adopted by the Secretary of Agriculture.

The term of the Contract was for ten years, beginning in 1960, and ending December 31, 1969, subject to termination on certain conditions, with an annual consideration payable each year in the amount of $2,119, to be shared by Mrs. Oden and the plaintiff on a 50-50 basis. The Contract was approved by the County Committee, and pursuant to its terms, the plaintiff received partial reimbursement for expenses incurred in preparing the land for seeding to grass.

The Contract provided that "[t]he undersigned producers hereby agree to the terms and conditions of this contract and certify that all of the producers having any control of the farm during the entire contract period and all of the producers who are entitled to payment under this contract are shown in this Part III . . ." Then followed the names and addresses of producers as listed under Part III showing Elburn G. Thomas, as operator, and Ruth E. Oden, as owner. Part V of the Contract provided, among other things, the following:

"1. Each of the owners or operators (hereinafter referred to as 'contract signer') whose signature appears in Part III above hereby agrees to participate in the Conservation Reserve Program for 1960 and fully understands that his participation therein is subject not only to all of the provisions of this contract, but also to all of the provisions of the regulations issued by the Secretary governing the Conservation Reserve Program for 1960. Such regulations, which

are hereby made a part of this contract, are hereinafter referred to as 'the Regulations.' . . ."

＊ ＊ ＊

"8. (a) In case of death, incompetency, or disappearance of any producer, any Federal cost-share or other payment under the contract due him shall be made to his successor, as determined in accordance with provisions of regulations issued by the Secretary (7 C. F. R. Part 1108), or any amendments thereto, for payments made pursuant to section 8 of the Soil Conservation and Domestic Allotment Act, as amended.

"(b) The loss of control of all or part of the farm by sale, death, or otherwise (a lease shall not be considered a loss of control) shall terminate the contract with respect to the acreage over which control is lost. In the event of such termination, unless the land is continued in the Conservation Reserve Program under the conditions specified in the Regulations, Federal cost-shares paid or payable with respect to the acreage over which control is lost shall be forfeited or refunded. In such case, each contract signer shall not only be obligated to refund all Federal cost-shares received by him but shall also be jointly and severally obligated with the other contract signers to refund all Federal cost-shares received by any person with respect to such acreage under this contract or any previous contract.

"(c) If the county committee is notified in writing, prior to making payment under an existing contract to a tenant (including a tenant operator) or to a sharecropper, that such tenant or sharecropper is no longer on the farm, payment shall be made only in accordance with the Regulations."

＊ ＊ ＊

"18. Any dispute concerning a question of fact arising under the contract, except contract violations (which are governed by separate regulations, see section 11 hereof), which is not disposed of by agreement, shall be decided by the State committee, in accordance with the provisions therefor contained in the Regulations. The decision of the State committee, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, shall be final and conclusive."

After the Contract was executed, Mrs. Oden died, and her Last Will and Testament was admitted to probate in Stafford County. In September, 1960, the County Committee notified the plaintiff in accordance with Part V, Paragraphs 8 (a) and (b) of the original Contract, that because of Mrs. Oden's death, it would be necessary to execute a new Contract with the plaintiff, as operator, and the executor of Mrs. Oden's estate, as temporary owner. The new Contract, in identical terms as the Original Contract except for the parties' signatory, was approved by the County Committee and was in force and effect until October 23, 1962. By the provisions of Mrs. Oden's Last Will and Testament, her son, Ivan A. Oden, became the owner of the quarter section. Again, in accordance with Part V

Paragraphs 8 (*a*) and (*b*) of the second Contract, a third Contract, in identical terms and conditions, was executed between Ivan A. Oden, as owner, and the plaintiff, as operator. The third Contract was approved by the County Committee on October 23, 1962, and was in full force and effect until August 1, 1966, as hereafter detailed. Annual payments were made thereunder in the amount of $2,119 for the years 1962, 1963, 1964 and 1965, which were shared equally by Ivan Oden and the plaintiff. The payments were made upon the certificate of both Oden and the plaintiff that compliance with all the requirements of the Soil Bank Program had been made.

The controversy out of which this appeal arises began in the spring of 1966. On April 11, 1966, Ivan Oden entered into a written contract with W. H. Dudrey for the sale of the quarter section here involved. The contract stated the real estate was in the Conservation Reserve Program. Thereafter and on May 31, 1966, Oden conveyed the quarter section to the defendant Elsie Dudrey, wife of W. H. Dudrey, by general warranty deed. The deed recited the conveyance was subject to,

". . . easements, if any, of record, and Subject also to *the rights of the agricultural tenant,* said premises now being under contract in the Conservation Reserve Program of the United States Department of Agriculture." (Emphsis supplied.)

On June 15, 1966, Elsie Dudrey served the plaintiff with written notice of termination of farm tenancy lease. The notice stated Elsie Dudrey had purchased the quarter section and that the plaintiff's farm lease thereon was terminated as of August 1, 1966. The termination as of August 1, was consistent with the original two-year lease between the plaintiff and Ruth Oden in 1949. Thereafter, and on August 1, 1966, the plaintiff surrendered possession of the premises. He has never questioned the right of Mrs. Dudrey to terminate his farm tenancy lease as of August 1, 1966. Outside of filing this action, Thomas never took any legal steps to keep Mrs. Dudrey out of possession, or attempted to regain possession of the farm. After that date, she and her operator had complete possession of the quarter section.

Prior to purchase of the real estate by Mrs. Dudrey, the plaintiff, and also the Dudreys, made inquiry of the Stafford County Committee regarding the effect on the Soil Bank Contract if the property be sold by Mr. Oden to Mrs. Dudrey. The parties were each advised that any sale of the property would terminate the Contract. They were also advised a new owner would have two options: One,

a new Contract could be entered into for the balance of the ten-year period remaining, providing the new owner-operator relationship was approved by the County Committee, and two, the new owner need not continue the land under the Soil Bank Program, but would have the right to cultivate and farm the land, and would have fifteen days after the purchase of the real estate to notify the County Committee of the change of ownership and to exercise the option.

Regulations adopted by the Secretary of Agriculture of the United States governing the Soil Bank Program for Contracts which include land for which 1960 was the first year of the Contract period and pertinent to this litigation, are attached as an Appendix to this dissent and incorporated herein. The reader is directed to those sections of the Regulations which are hereafter referred to.

As the new owner, Elsie Dudrey advised the County Committee she would continue the quarter section under the Soil Bank Program, and that pursuant to Part V, Paragraph 8 (c) of the Contract, and in accordance with Regulation Sec. 485.526, Successors-in-interest, (b) and (c), she had leased the property to W. H. Dudrey as the new tenant-operator.

On July 7, 1966, the County Committee made a determination that Thomas lost control of the land by reason of the sale to Mrs. Dudrey and his surrender of possession of the farm on August 1, 1966, as the agriculture tenant, and that the Contract which he and Oden had executed on October 23, 1962, was terminated. Thereupon, the County Committee approved the change of operators from Thomas to W. H. Dudrey, and a new Contract was entered into between the County Committee, Elsie Dudrey, as owner, and W. H. Dudrey, as operator, covering the last half of 1966, and ensuing years. Payments made for the last part of 1966, and for 1967, 1968 and 1969, were paid one-half to Elsie Dudrey, as owner, and one-half to W. H. Dudrey, as operator, pursuant to the terms of the new Contract, and Sec. 485.526, Successors-in-interest (b) (c).

Thereafter, and on August 15, 1966, the plaintiff filed a written request with the County Committee "For Reconsideration of Determination," pursuant to Sec. 485.537, Appeals, seeking to have the County Committee change its ruling, "[t]hat he had no further rights in the conservation contract, except as to the payments in 1966."

The meeting with the County Committee was attended by the plaintiff and his attorney. Following the hearing, the County Com-

mittee affirmed its determination that by reason of the sale to Mrs. Dudrey and Thomas' surrender of possession of the farm, the Contract between the plaintiff, Ivan Oden, and the County Committee, was terminated as provided in paragraph 8 (*b*). It further determined there was a bona fide change in the tenant relationship, and concluded the plaintiff had been replaced by the owner with a new tenant. Pursuant to Sec. 485.526 (*c*) it was further determined that Ivan Oden and the plaintiff were entitled to receive their prorated share of the 1966 payment as of August 1, 1966, in the sums of $529.75 and $617.69, respectively. (§ 485.535, Finality of determination.)

Thereafter, the plaintiff appealed to the State Committee pursuant to Sec. 485.537, Appeals, from the ruling made by the County Committee under Part V, Paragraph 8 (*b*) of the Contract. The State Committee, having jurisdiction pursuant to Part V, Paragraph 18 of the Contract, duly considered the plaintiff's appeal upon the evidence submitted, and on March 1, 1967, rejected the same and refused to set aside or modify the decision of the County Committee that the operator of the farm had been duly and properly changed to W. H. Dudrey.

The plaintiff, being dissatisfied with the decision of the State Committee, perfected an appeal to the Deputy Administrator, United States Department of Agriculture, Washington, D. C., pursuant to Sec. 485.537 (*b*), Appeals. He was afforded an opportunity to be heard and to offer evidence in support of his appeal.

On August 10, 1967, the Deputy Administrator advised the plaintiff that,

". . . In this regard our legal staff has advised as follows: 'Whether, under the circumstances, Mr. Thomas' lease was extended through 1969 and cannot be legally terminated any earlier is a question between him and the landlord to be resolved by the Kansas Courts.'

"Our review indicates that Mr. and Mrs. Dudrey have exclusive possession of the farm and that you are no longer an actual producer on the farm. *Under such circumstances, no further payments can be made to you.*" (Emphasis supplied.)

It is a general rule of this court on appellate review that it will not consider a case on a theory other than that adopted by the parties in the court below. (*Potwin State Bank v. Ward*, 183 Kan. 475, 327 P. 2d 1091; *Ogden v. Continental Casualty Co.*, 208 Kan. 806, 494 P. 2d 1169.) However, as indicated, the court proceeds to decide this case upon an issue not briefed or argued by the

parties. In discussing the issues as presented to this court by the briefs and oral argument of the parties, I think it is imperative that those issues be stated.

The appellee Thomas' brief stated the question to be decided, as follows:

"Did the entering into the conservation reserve contract constitute an extension of the farm lease until December 31, 1969?"

The appellant Dudreys' brief states the issue as follows:

"Did Thomas have any rights . . . to . . . soil bank payments under the soil bank contract . . . . after the sale of this property . . . to Elsie Dudrey . . . and the approval by the County Committee of W. H. Dudrey as operator of this land?"

Before discussing and deciding the issue as stated by the parties, and then answering the rationale of the court in affirming the judgment, I first refer to the Soil Bank Act, state its general purpose, and the relationship existing between a landlord and tenant, and the Secretary.

The Soil Bank Act was passed by Congress for the twofold purpose of combating problems created by ever mounting surpluses of agriculture products, and to conserve natural resources. Basically, the soil bank plan is that farm lands will be withdrawn from agriculture production and that conservation practices will be initiated and maintained on the idle land. (*Holden v. U. S.*, 187 F. Supp. 790, affirmed 297 F. 2d 831.) To effectuate that plan, the Act authorizes federal assistance to farmers in diverting cropland from production of excess commodities declared inimical to the national welfare, and to the development and implementation of programs to conserve the physical resources of soil, water, forests, and wildlife. (7 U. S. C. A. § 1801, *et seq.*)

As a consideration for the agreement of the landlord and tenant when that relationship exists, the government undertakes to bear a part of the cost of establishing and maintaining the conservation practices called for by the Contract, and also to make annual payments to the parties on a per acre basis during the period of the Contract, or until it is otherwise terminated pursuant to the Regulations and the terms and conditions of the Contract to which the farmer or the parties have agreed. (*Holden v. U. S.*, supra; 7 U. S. C. A. § 1831 [*b*].)

The Soil Bank Act directs the Secretary to provide safeguards to protect the interests of tenants for sharing on a fair and equitable

basis in payments for withdrawing lands *they farm under a farm lease,* from production, including such as may be necessary to prevent them from being forced off the farm. Applications to participate in the program shall specify the basis on which the landlord and tenant are to share in such payments, *and no Contract under the Soil Bank Program shall be entered into unless the basis of payment is approved by the County Committee and incorporated into the Contract.* The standards prescribed by the Secretary for the guidance of the County Committee shall include considerations to the respective contributions which would have been made by the landlord and tenant in the production of crops pursuant to their farm lease. (7 U. S. C. A. § 1810.)

When a Kansas landowner desires to place his land in the Conservation Reserve Program and the land is being farmed by a tenant on the basis of a division of crops pursuant to a written or oral farm lease, or as here, where he is a "holdover" tenant with the consent of the owner under Kansas law (K. S. A. 58-2502), it is necessary that both the owner and the tenant enter into a contract with the Secretary of Agriculture through the County Committee (7 U. S. C. A. § 1810)—the form and content of which are prescribed by the Act and the Regulations. The Contract is the means by which the intent of Congress is implemented to take land out of agricultural production, to initiate conservation practices, and to provide assistance to landlords and tenants for their cooperation. The landowner, by reason of his ownership, is a necessary party to the Contract, *and the farm tenant, who is in possession and control of the land by reason of his farm lease,* is likewise a necessary party to the Contract. (7 U. S. C. A. § 1810.) The execution of the Contract is, of necessity, a joint undertaking on the part of the landlord and the tenant to withdraw the land from agricultural production and maintain conservation practices on the idle land. In other words, the Act and the Regulations are so prescribed that where a landlord-tenant relationship exists, the owner is required to take the tenant "along", so to speak, and the division of payments for withdrawing the land from agricultural production *must be approved by the County Committee and stated in the Contract.*

When an owner and tenant jointly enter into a Contract they agree, among other things, that for a period of not less than three years (here ten years) they will establish and maintain certain conservation practices on the land placed by them in the Conserva-

tion Reserve; *that they will not harvest crops therefrom,* or other natural products which would increase supplies of feed for domestic animals, and with certain exceptions, will not permit the land to be grazed or hay to be cut, nor adopt any practice or farm use which would tend to defeat the contractual purpose of withdrawing the land from production. (7 U. S. C. A. § 1831 [*a*].)

It was not the intention of Congress, as implemented by the Contract, to vest any authority in the Secretary *to acquire any land or interest or rights therein.* (16 U. S. C. A. 590h [b].) Its only purpose was to withdraw land from the production of agriculture products and to require the carrying on of soil rebuilding practices rather than the growing of soil depleting crops. In that respect, *the Contract is personal, and binds only the parties who are signatories and have certified they have control of the land.* Moreover, the Act and Regulations expressly recognize that during the period of a Contract, the land may be sold by the owner and that he may change tenants for reasons stated in Part V, Paragraph 8 (*b*) of the Contract and Regulation § 485.526, Successors-in-interest, for "the loss of control of all or part of the farm by sale, death, or otherwise (a lease shall not be considered a loss of control), which terminate the Contract with respect to the acreage over which control is lost." The words "sale" and "death" are of common understanding, and it is my opinion that the use of the word "otherwise" was intended to mean the right of the owner to sever a farm-tenant relationship pursuant to state law, and to secure a new and succeeding tenant if the County Committee, which was selected by Congress to administer and police the Act and Regulations locally, determines that the new tenancy was lawfully secured and was not in contravention of the Congressional mandate to protect the rights of tenants and sharecroppers. (16 U. S. C. A. § 590h [*b*] and [*f*]; 7 U. S. C. A. § 1810.)

The meaning and effect of a Contract between the Secretary and a landlord and tenant, are matters of federal law and not state law. (*Wood v. DeWeese,* 305 F. Supp. 939.) To that extent, if the Act and Regulations were intended to create rights or interests in land, or grant possessory rights therein, it is clear that, under the Supremacy Clause of the Federal Constitution (Article VI), the relationship of landlord and tenant under state law would be superseded by the Act, and any local laws or rights thereunder would be preempted by the Congressional policy. But the Act, the Regulations, and the Contracts here involved do not have that effect.

As is indicated by the record, after the landlord and tenant placed the land in question in the Soil Bank Program, its management and division of income were affected not only by rights and obligations arising under the Act, but also by other rights and obligations arising under the tenancy relationship as defined by state law.

The fact the Contract substituted nonproduction for production as contemplated under the farm lease, and provided a different division of cash income in lieu of rentals for cultivating and harvesting crops, did not supersede Thomas' rights as a tenant giving him possession and control of the land. Again, his right of possession and control of the land arose and existed only by virtue of the landlord-tenant relationship. The Act, the Contract, and the Regulations expressly recognized the existence of leases as a means of managing and operating farms; Part V, Paragraph 8 (*b*) states that "a lease shall not be considered a loss of control" of land. Moreover, the certification of the tenant-operator that he is one of the parties having control of the farm clearly indicated that *control* arises extrinsic of the Contract. At most, the Contract withdrew the land from production and provided a different income and division thereof, but it did not convey any possessory rights to the land, or change the existing relationship of the landlord and tenant under a "holdover" agriculture farm lease.

During World War II, federal legislation created an analogous situation in which the landlord-tenant relationship, a matter governed by local law, was modified by regulations relating to rent control. This court held the federal regulations did not supersede the state law, or tenancy rights thereunder, rather, the local law was altered to the extent that it was inconsistent with the regulations. See *Richie v. Johnson,* 158 Kan. 103, 144 P. 2d 925, and *Morrison v. Hutchins,* 158 Kan. 123, 144 P. 2d 922. Likewise, the Soil Bank Act modified the landlord-tenant relationship only as to crop production and division of cash income. The Secretary and the County Committee jealously guarded the rights of tenants to be certain that they were not forced off the land by unscrupulous landlords, and the approval of the County Committee was required as a condition precedent, before a tenant could be removed from control of a farm.

It is my opinion the Act, the Regulations, and the Contracts in question have limited bearing on the change of a tenant in Kansas. Provided proper service of the termination notice is secured, the Regulations (§ 485.526) expressly authorize and permit a change of

tenants by the owner producer during the period the land is under Contract, *subject always to the approval of the County Committee.*

The two-year lease agreement between Mrs. Oden and Thomas is governed by state law, and leaves no doubt they intended the relationship to be that of landlord and tenant. Thomas was entitled to the exclusive possession and control of the property until August 1, 1951, and each year thereafter which he "heldover" under that lease with the consent of the owner. (*Giese v. Weeden,* 165 Kan. 551, 196 P. 2d 207; K. S. A. 58-2502 and 58-2506.)

Thomas had held over under the lease for over eight years when the Contract was entered into on November 12, 1959. His certificate on the Contract that he was a producer having "control of the farm" resulted solely from his right of possession and control of the land as a tenant from year to year. He had no right of possession or control otherwise. The basic relationship between Thomas and the owner of landlord and tenant, and his right to possession and control of the land, was not changed or affected when the Contract was entered into. Although the division of cash income received from the government for withdrawing the land from production differed from rentals received from cultivating and harvesting crops, his year to year tenancy under the written lease continued throughout the period of the several Contracts, and until it terminated on August 1, 1966. (K. S. A. 58-2506.) *The three separate Contracts confirmed his rights under the lease as such tenant, which was his sole means of possession and control of the farm; he had no possessory rights to the land otherwise.* As a tenant from year to year he could and did certify on three Contracts that he was a *producer* and had "control of the farm." However, when his tenancy from year to year was terminated on August 1, 1966, and he voluntarily surrendered possession of the farm pursuant to the new owner's statutory notice, his right of tenancy ceased, and thereafter *he had no "control of the farm," and he had no rights as a "producer" under the Contract. All this resulted in the termination of the Contract.* (Part V, Paragraph 8 [*b*]; § 485.526.)

No authority is cited by the appellee nor can this court find any, indicating that the Contract is in effect a lease, or an extension of a lease, for the duration of the agreement. Until such authority is shown, I must conclude the Contract has no characteristics of an agricultural lease establishing the relationship of landlord and ten-

ant, and did not constitute an extension of the farm lease until December 31, 1969.

Cases which have considered the question whether a Soil Bank Contract gives possessory and other property rights in the nature of a farm lease, have held it does not. While the court's opinion attempts to distinguish the case of *Hill v. Schuhart,* 391 S. W. 2d 579 (Tex. Civ. App.), *the sole issue* was whether the Soil Bank Contract, by its terms and the Regulations of the Secretary, *leased* the land in question to the appellant for the full term the land was in the Soil Bank Program. The court said:

"We have not been cited to any authority, and neither have we found one, interpreting the Soil Bank agreement *holding that said agreement gave the tenant a lease for the full term of the agreement* . . .

\* \* \*

". . . *Neither do we find anything in the agreement giving appellant a lease for the duration of the Soil Bank agreement.* We are of the opinion, and so hold, that under the terms of the agreement and the regulations as prescribed by the Secretary *that Mrs. Steele, the owner, had the right to cancel appellant's right to possession at the end of the year he had a lease thereon and that the Soil Bank agreement did not give him a lease for the duration of such agreement.*" (pp. 580, 581.) (Emphasis supplied.)

See, also, *Brown v. Gray,* 383 S. W. 2d 950 (Tex. Civ. App.).

In *Reimann v. United States,* 196 F. Supp. 134 (Idaho), the plaintiff farm operator commenced an action to avoid a penalty for a claimed *violation* of the Soil Bank Contract, and to have the Contract which his wife did not sign, declared void *ab initio.* The plaintiff argued the Contract was an "encumbrance" within the meaning of an Idaho statute prohibiting the husband from encumbering community realty without the consent of his wife. He contended the Contract was in effect a farm lease, thus encumbering title to the property. The court responded to the contrary, and said:

". . . *A lease is an encumbrance because it affects the title to the land. It binds the realty and follows it into the hands of all purchasers* . . . *A soil bank conservation reserve contract is personal, binding only the parties thereto. It does not bind subsequent owners of the land who do not become parties to the contract.* Under the terms and conditions thereof, Part V, 8 (b), 'loss of control of the farm by sale or otherwise by any signatory to the contract' terminates the contract as to such producer . . . *In addition, the United States acquires no interest in the land by virtue of its contract. It cannot demand possession of the land or have free enjoyment of the same.* Its only recourse when any signatory fails, or partially fails, to comply with the terms and conditions of the contract is by way of a decrease or forfeiture of payments, termination of the contract and an assessment of a civil penalty in

accordance with the provisions of the Soil Bank Act, 7 U. S. C. A. § 1801 *et seq.*

"It is true, as plaintiffs point out, that the owner's use of the land included in the contract is substantially curtailed by government regulations. However, it is questionable whether such regulations constitute an interest in the land which subsists in third persons 'to the diminution of the value of the land.' In view of the widespread, voluntary participation in the soil bank program, its objectives and results, it is apparent that the benefits derived by such participation outweigh the detriments.

"Furthermore, by virtue of the Idaho statute quoted above, the husband has the management and control of the community property. He can farm the community property as he sees fit, market the crops, receive the proceeds therefrom and spend them without his wife's consent . . . Here too this Court believes a soil bank conservation reserve contract executed solely by the husband, plaintiff Henry F. Reimann, was within his authority as manager of the community property. *He voluntarily chose this means to receive income from and improve the community farm as an alternative to cultivating and harvesting crops.* By so doing he in no way encumbered the community real property, but he did personally obligate himself as the manager of the community property to fulfill the terms of the contract." (pp. 136, 137.) (Emphasis supplied.)

The language in *Dickson v. Edwards*, 293 F. 2d 211 [5th Cir.], cited by the majority, recognizes that lease relationship, affecting land which is in the Soil Bank Program, may be in existence, and the effect of those relationships arising extrinsic of the Contract are matters of state law. There, it was said:

"While we therefore fully approve the District Court's holding that this was not a termination because of an asserted *violation* and accordingly beyond the power of the District Court to adjudicate, we wish to make doubly clear that nothing said or unsaid is to be understood as an approval or disapproval by us of the propriety of the action of the County Committee, the State Committee, the Secretary, the Landowner or the new Tenants. The right under the law of Texas between Dickson and the Landowner or between him and the successor Tenants with respect to Soil Bank payments received in 1958 and subsequent years are matters for subsequent adjudication in Texas courts. Such matters were not before the District Court nor are they before us."

❋ ❋ ❋

". . . The Soil Bank comes into the case only when the private defendants [landowners] as a defense to that claim assert that such Act has some decisive significance. Without intimating the correctness of such views, this might take several different forms. For example, the defendants might contend that since the Soil Bank Act permits payment only to a 'producer' and the status of Dickson as such a producer was brought into question after his lease ostensibly 'expired,' the matter was committed to the judicially unreviewable decision of the County Committee and the State Committee. . . . *To determine the correctness of this conclusion, the Court hearing that defense*

*would, of course, have to interpret the Soil Bank Act to determine whether such matters were of a kind contemplated by Congress to be for decision by such farmer neighborhood courts.* . . .

"On such suppositions or others readily suggested, such a court will have to determine these questions of statutory construction and application. But it will do so only as a defense, that is as an impediment to the plaintiff's equitable claim or for declaratory relief. *That means that a state court will have to adjudicate federal statutory problems.* But this happens often in our complex federalism . . ." (pp. 215, 216.) (Emphasis supplied.)

I conclude the Act, the Regulations, and the Contracts in question have absolutely no bearing upon the right of a landlord to change a tenant under Kansas law upon proper service of notice of termination of a "holdover" tenancy, as present in this case, provided the landowner reports the fact of such change of tenancy to the County Committee and it approves the new tenant. In fact, the Regulations [§ 485.526] expressly authorize a change of tenant during the period land is under Contract, if the transaction is approved by the County Committee. Moreover, having pursued and exhausted his administrative remedies, Thomas is bound by such procedures and decisions made pursuant thereto.

I turn now to the court's reasoning for its affirmance of the judgment below. It is apparent that the court deems the crux of this case is what occurred when Oden sold the land to Mrs. Dudrey and his deed conveying the property to her reciting she took title ". . . Subject also to the *rights of the agricultural tenant,* said premises now being under contract in the Conservation Reserve Program of the United States Department of Agriculture." (Emphasis supplied.)

The following excerpts from the court's opinion set forth its rationale for affirmance:

"[p]laintiff [Thomas] is suing Dudrey for wrongfully violating a duty which Dudrey assumed when he purchased the land."

"His [Thomas'] present *claim arose by reason of the original conservation reserve contract* [January 1, 1960] *and the rights in the subsequent revised contracts which were reserved to him when Ivan A. Oden sold the land to the Dudreys subject to his rights.*"

"The conservation reserve contract *which assured the plaintiff of his rights as tenant-operator* was on file as a public record in the ASC office of the County. The purchaser had notice of these rights. Under both the contract of purchase and the deed the property *was subject to the rights of the plaintiff created by the conservation reserve contract.*"

"In the present case *plaintiff's rights in the soil bank contract were recognized by the Dudreys when they purchased the land subject to those rights.* Plaintiff's cause of action for damages is based upon the obligation placed

upon the Dudreys by the Contract of Sale and the deed from Ivan A. Oden."

"The soil bank payments due the *operator* were wrongfully obtained by the Dudreys and suit was properly brought to recover the same from them." (*Emphasis supplied.*)

If the deed from Oden to Mrs. Dudrey contained an express reservation of Thomas' rights to the extent the court somehow *infers* it does, I would join the court's opinion. But the court is in error because all that the deed recited was that Mrs. Dudrey took title to the land subject to easements of record, "and Subject also to the *right of the agricultural tenant* . . ." with the further recital that the land was then under contract in the Conservation Reserve Program.

The court's opinion leaves unanswered the question submitted by Thomas' brief for affirmance. However, what was the significance of the exception and contractual obligations contained in Oden's deed to Mrs. Dudrey? Further, what were Thomas' rights in the land *as an agricultural tenant* which Mrs. Dudrey assumed?

The court's statements infer that the recitals in the deed from Oden to Mrs. Dudrey were a "one-way street", exclusively intended for Thomas' benefit and protection; that Thomas' claim arose by reason of the original Contract and his rights in subsequent Contracts were reserved to him when Oden sold the land to Mrs. Dudrey *subject to his rights;* that those Contracts assured the plaintiff *of his rights as a tenant-operator,* and that under both the Contract of purchase and the deed, the property was subject to the rights of Thomas created by the Soil Bank Contracts.

There is nothing in the record to justify that inference other than the language of the deed itself, and I submit the language of the deed containing the contractual recitals could be equally and cogently inferred for Oden's benefit and protection. It must be remembered that under Part V, Paragraph 8 (*b*) of the Contract, when the land is sold, and the Contract covering the land is terminated by that event, unless the land is continued in the Conservation Program, federal cost-shares paid with respect to acreage over which control is lost, are forfeited, making each Contract signer—here Oden and Thomas—not only obligated to refund all payments received by him (Oden), but also those payments received by other signers (Thomas) and making each signer jointly and severally liable for federal cost-shares received under the Contract terminated, and *also any previous Contracts.*

In my judgment it is arguable that Oden sought to insulate himself from the joint and several liability of all payments under the 1962 Contract, which Thomas received, as well as payments Thomas received under the two previous Contracts.

Be that as it may, the burden of proof was upon Thomas to establish what Oden intended when he deeded the land to Mrs. Dudrey. However, Thomas did not produce Oden as a witness to testify at the trial, nor did he take Oden's deposition. In any event, there was no competent evidence introduced to establish Oden's intention when he deeded the land to Mrs. Dudrey. I think it is unwarranted for this court to decide this lawsuit upon the assumption the language of the deed was intended exclusively for Thomas' benefit, when it may be equally argued that Oden was attempting to protect himself from the joint and several liability imposed upon him by the Contract.

Moreover, if the court is relying upon whatever rights Thomas might have had under the Contracts as a *tenant-operator*, then it is clear he is bound by the terms and provisions of those Contracts, and the determination of the County Committee, the State Committee, and the Secretary, that he had lost control of the farm and was no longer an "operator," and, therefore, was not entitled to receive payments for years subsequent to 1966.

Turning to the question, what rights did Thomas have as an *agricultural tenant* which Mrs. Dudrey assumed? When Mrs. Dudrey became owner of the land, she had the right to choose from two of four options. First, she could continue the land in the Soil Bank Program for its remaining years. Second, she could plow under the grass and cultivate the land. Third, she could continue Thomas' "holdover" tenancy regardless of whether she cultivated the farm, or elected to continue the land in the Program. Fourth, she could terminate Thomas' tenancy and right to possession of the land under state law. She elected to pursue her rights under options First and Fourth, by keeping the land in the Program, and she followed the statutory procedures necessary to insure that the conditions under which the property was conveyed would not be broken. Thomas recognized the validity of the statutory notice and surrendered possession of the farm on the date the holdover tenancy terminated.

As previously indicated, the relationship between the parties to this litigation is controlled by federal law and state law, as well as

agreements made pursuant thereto. The significancy of the Contracts in this case is that they modify the landlord-tenant relationship insofar as they withdrew the land from production and provided a different division of cash income; and that is the extent and degree of federal preemption. It has been conclusively demonstrated that under the federal law the Contracts granted no rights in land, or any interest therein, or possession thereto. At most, the three separate Contracts were personal between the parties which represented the intention of Mrs. Oden, her executor, Ivan A. Oden, and Thomas, to withdraw the land from production and to receive cash income. The original Contract did not constitute a lease or encumbrance so as to bind subsequent owners, including Ivan A. Oden, or Mrs. Dudrey, who were not parties to it, nor did it affect title or possession to the land in any respect. There was nothing in the terms and provisions of the various Contracts, nor in the Act itself, or the Regulations, to the effect that Thomas would have a lease upon, or rights in the land, so long as it was in the Soil Bank Program. In fact, the original Contract terminated upon Mrs. Oden's death pursuant to Part V, Paragraph 8 (b) of the Contract. Likewise, the two Contracts showing the executor as temporary owner, and Ivan A. Oden as owner, did not affect the title, possession or control of the land in any respect, and each of those Contracts were terminated respectively when title to the land was vested in Ivan A. Oden, and when he sold the land to Mrs. Dudrey.

In my opinion, the relationship that has controlling significance in this lawsuit is that of landlord and tenant as defined and controlled by Kansas law. (K. S. A. 58-2502, 58-2506.) As has been pointed out, Thomas' right to possession and control of the land resulted solely from his status as a "holdover" agricultural tenant from year to year. His holdover tenancy arose by virtue of his continuance in possession of the farm with the consent of owner following the expiration of the original two-year written farm lease on August 1, 1951.

Under the facts and circumstances, *Mrs. Dudrey did not breach any rights or obligations she assumed under Oden's deed to her. She was within her legal right to prepare and serve the notice of termination of tenancy upon Thomas effective August 1, 1966, and Thomas recognized the validity of that notice by voluntary surrender of possession of the land on that date.* Moreover, she reported the sale of the land, and the County Committee approved

the change of agricultural tenant. In addition, I could agree with the Court's conclusion that Thomas did not lose "control" of the farm by reason of Oden's deed to Mrs. Dudrey. She agreed to take title subject to Thomas' rights as an *agricultural tenant*. But that recital in the deed becomes relatively unimportant, because a farm lease, or as here, the rights of a holdover tenant, binds the realty and follows it into the hands of all purchasers. *Until Thomas' rights as a holdover tenant were lawfully terminated by the new owner*, he had possession and control of the land. But those rights were lawfully terminated on August 1, 1966.

I turn again to the court's opinion and quote excerpts that are critical of alleged conduct of the Dudreys which the court states violated the Act, the Regulations, and the terms of the Contract. The court concludes:

"The Dudreys . . . in violation of their agreement . . . were able to *squeeze plaintiff off the land with the aid of the county committee*." (Emphasis supplied.)

and further:

". . . *by the simple ruse* of taking title to the land in the wife's name and notifying the A. S. C. Committee that the husband was the new agricultural tenant they obtained both the operator's and the owner's share . . . *This violated both the purpose and spirit of the soil bank program*." (Emphasis supplied.)

If the court is of the opinion the conduct of the Dudreys *violated* the purpose and spirit of the Soil Bank Act, then this court is without jurisdiction to consider this case, as such a violation has been assigned to the federal courts for determination. (7 U. S. C. A. § 1831; *Dickson v. Edwards,* supra; *Caulfield v. U. S. Department of Agriculture,* 293 F. 2d 217 [5th Cir.], cert. dis. 369 U. S. 858, 8 L. Ed. 2d 16, 82 S. Ct. 946.)

Furthermore, the court's conclusion that the Dudreys acted in concert with the County Committee and "were able to squeeze plaintiff off the land" with the aid of the County Committee, is contrary to the declared Congressional intent as interpreted by the federal courts, that the County Committees, and the administrative procedures for appeal, were established to enforce 7 U. S. C. A. § 1810, to safeguard the rights of farm tenants from being forced off the land by unscrupulous landlords. In the Congressional plan to withdraw land from agricultural production and to conserve national resources, the County Committee established by the Act, has an important role. The Act and the Regulations indicate posi-

tively that Congress meant to establish an impartial Committee consisting of *local* people having *local* responsibility for decisions concerning *local* factual disputes having a definite *local* impact. (*Fulford v. Forman,* 245 F. 2d 145 [5th Cir.].)

The case of *Caulfield v. U. S. Department of Agriculture,* supra, cited by the majority, is further authority for the proposition that decisions of factual disputes were delegated by Congress to the County and State Committees. There it was stated:

"Granting but a limited review, the inference is compelling that Congress deliberately intended to keep the practical operation of this farm program out of the courthouse. *Whatever might be thought to be the shortcomings of the informal tribunals of County and State Committees made up as they would be by persons having evident self-interests, Congress purposely undertook to lodge immediate responsibility in these neighborhood tribunals. Nearness to the problem and to the people affected—or afflicted—by adjudications having decisive consequences may well have been to Congress the assurance of responsible impartiality.* See Fulford v. Forman, 5 Cir. 1957, 245 F. 2d 145, 147.

"*Indeed, the legislative history supports the view that in effectuating the vigorous policy against the use of any devious schemes by landowners as a means of discriminating against tenants Congress looked to the County Committees as the means of positive enforcement.*

"Congress presumably put its faith in the localized and immediate responsibility of these groups as their decisions had to pass muster in the particular community. It purposely chose this in preference to its unsuccessful effort to legislate more precise standards to protect tenants who, from ignorance or poverty or lack of resources, were looked upon as a more helpless class.

"This is, of course, but another instance in which Congress creating the grant of public funds may determine the basis upon which money is to be paid or distributed. This includes as well the machinery for the determination of the facts upon which statutory standards are to operate. As Congress did not permit judicial review of any decisions other than that of a violation of a contract by a producer, neither the District Court nor this Court has the power to say whether the action of the County and State Committees was correct." (pp. 220, 221.) (Emphasis supplied.)

At this point, it is unnecessary to reiterate that Mrs. Dudrey, as the new owner, reported the sale of the land to the County Committee and that she had designated a new tenant-operator. It is sufficient to say the County Committee approved her change of tenants, and again reaffirmed its decision after Thomas and his attorney sought a redetermination whether he had lost his rights as operator of the land, or to again state the results of his appeal to the State Committee. Thomas sought the protection afforded by those administrative procedures and followed them through to the

office of the Secretary in Washington, D. C. Whether there was a bona fide change of tenants was a disputed fact throughout the entire administrative procedures, and under Part V, Paragraph 18, of the Contract, and Secs. 485.535 and 485.537 of the Regulations, the decision of the State Committee, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessary to imply bad faith, *shall be final and conclusive.*

There is nothing in the record that even implies or suggests the decision of the State Committee was fraudulent or caprice, or so grossly erroneous as to imply bad faith. The district court made no finding on the matter, nor is that point raised even by implication in the briefs of either party. As heretofore indicated, Thomas is now estopped to deny that the State Committee's determination of the disputed fact there was a bona fide change of tenancy following Mr. Dudrey's purchase of the land, was anything but final and conclusive.

In my opinion, the court's conclusion that through the *"simple ruse"* to take title to the land in the wife's name, the Dudreys violated both the spirit and purpose of the Soil Bank Program, and that there was no bona fide change of tenants, is not warranted. In connection with this conclusion, it should be noted that when Thomas rested his case in the district court, a dialogue took place between the court and Thomas' attorney to the effect that Thomas was relying upon a scheme and fraud on the part of the Dudreys in changing tenants. There had been no evidence introduced by Thomas on the subject, and the court stated that in its view ". . . you have introduced no evidence in support of that whatsoever." There was no evidence of any sham, fraud, scheme, or device, used by the Dudreys with respect to a change of tenants. Furthermore, Thomas sought administrative relief pursuant to Part V, Paragraph 18 of the Contract. As we have said in numerous cases, where parties freely and voluntarily enter into a Contract within which is contained express language that the parties intend a person or persons designated to decide upon matters entrusted to them, and the parties agree the decision is to be final and conclusive, then that clear meaning will be honored and recognized by the courts. (*Coleman v. Local No. 570,* 181 Kan. 969, 317 P. 2d 331; *O. K. Johnson Electric, Inc. v. Hess-Martin Corporation, Inc.,* 204 Kan. 478, 464 P. 2d 206.)

It is apparent under the decided law that Thomas is bound by the decision of the County and State Committees that he had lost control of the farm.

In conclusion, Thomas was entitled only to proper notice to terminate his holdover tenancy. Under the facts and circumstances, he was accorded that notice and surrendered possession of the farm on August 1, 1966. Thomas received his pro rata share of the 1966 operator's payments consistent with the period in 1966 in which he was in control of the farm as the holdover tenant-operator, as determined by the County Committee. In short, the record shows that when Mrs. Dudrey purchased the farm in question *subject to the rights of the agricultural tenant,* she took steps necessary to insure the conditions under which the property was conveyed would not be broken. Assuming the Act, the Regulations, and the Contracts in question did have a substantial bearing on Thomas' tenancy rights as the majority concludes, then the appellee would still have to be denied recovery as whatever rights he may have had by virtue of the Contracts were defeasible in accordance with the expressed terms and provisions of Part V, Paragraph 8 (*b*) of the Contracts, as well as the Regulations. Lastly, Thomas' actions in voluntarily surrendering possession of the farm, seeking to adjudicate his rights under the Contract through the administrative procedures, and failure to sustain the burden of proof that the determination of the County Committee was permeated with fraud, constituted arbitrary or capricious conduct, or was so grossly erroneous as to imply bad faith, are inconsistent with any argument to the contrary that his right to control had not been lawfully extinguished. He is now estopped from asserting the same in this litigation. (*Browning v. Lefevre,* 191 Kan. 397, 381 P. 2d 524; *Weltmer v. Mathis,* 186 Kan. 327, 349 P. 2d 877; *Bowen, Administrator v. Lewis,* 198 Kan, 706, 426 P. 2d 244.)

In my opinion, the district court erred in failing to sustain the defendants' motion for summary judgment. The case should be reversed and remanded with directions to sustain that motion and enter judgment for the defendant.

SCHROEDER, J., joins in the foregoing dissent.

## "APPENDIX"

"Conservation Reserve Program Regulations"

"§ 485.501 Definitions.

"As used in this subpart and in all contracts, forms, documents, and procedures in connection therewith, unless the context or subject matter otherwise requires, the following terms shall have the following meanings:"

\* \* \*

"(*b*) 'Secretary' means the Secretary of Agriculture of the United States, or the officer, employee, or other representative of the United States Department of Agriculture acting in his stead pursuant to delegated authority.

"(*c*) 'Administrator' means the Administrator or Acting Administrator of the Commodity Stabilization Service, United States Department of Agriculture."

\* \* \*

"(*i*) *'County committee' means the group of persons elected within a county as the county committee pursuant to the regulations governing the selection and functions of the Agricultural Stabilization and Conservation county and community committees.*

"(*j*) 'State committee' means the group of persons designated for a State by the Secretary as the Agricultural Stabilization and Conservation State committee."

\* \* \*

"(*m*) *'Share tenant' means a person other than a sharecropper who rents land from another person and pays as rent a share of the crops or the proceeds thereof.*"

\* \* \*

"(*p*) *'Producer* means any person who is an owner or landlord, cash tenant, standing-rent tenant, fixed-rent tenant, *share tenant,* sharecropper, or in the case of rice, a person who furnishes water for a share of the crop."

\* \* \*

"(*w*) 'Contract' means a Soil Bank Conservation Reserve Contract (Form CSS-861 (Soil Bank))."

\* \* \*

"§ 485.502 Administration.

"(*a*) The Conservation Reserve Program will be administered

in the field by State and county committees under the general direction and supervision of the Administrator . . ."

\* \* \*

"§ 485.511 Modification and termination of contracts.

"(*a*) Contracts shall be modified as required by § 485.516 or § 485.526 (*b*) (2) . . ."

\* \* \*

"§ 485.526 Successors-in-interest.

\* \* \*

"(*b*) (1) When any producer signatory to the contract who has control of the farm loses control of all or a part of the farm by sale, death, or otherwise, the contract shall terminate with respect to the acreage over which control is lost. In the event of such termination, the producer who acquires control of such acreage may enter into a conservation reserve contract which will continue such acreage in the conservation reserve for the duration of the contract period under the same terms and conditions if one of the following conditions exists: . . . (*ii*) the land over which control was lost was under a conservation reserve contract for at least three years prior to termination . . . (*e*) . . . *A change of tenants . . . signatory to the contract but who do not have contol of the farm shall be handled in accordance with paragraph (c) of this section*"

\* \* \*

"(*c*) *If the county committee is notified in writing,* prior to payment of compensation under an existing contract to a tenant (including tenant operator) . . . *that such tenant . . . is no longer on the farm, the county committee shall determine the division of compensation between the original tenant . . . and the successor tenant . . . on a basis which it determines to be fair and equitable . . .*"

\* \* \*

"§ 485.534. State committee approval of determinations of county committees.

"The State committee upon its own motion or at the request of any person may revise or require revision of any determination made by the county committee in connection with the Conservation Reserve Program except that the State committee may not make a revision of any executed contract other than as specifically authorized herein.

"§ 485.535. Finality of determinations.

"The facts constituting the basis for any payment, or the amount thereof, under any contract when officially determined in conformity with applicable regulations shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government, except that the Act provides for judicial review in the case of the termination of a contract."

\* \* \*

"§ 485.537 Appeals.

"(a) *Any producer may request the county committee to reconsider, prior to the signing and filing of the contract by the producer, any determination made by the county committee affecting the contract except rates of payment.* Such request shall be in writing and shall be made within 15 days after notice to him of such determination. The producer shall be deemed to have received notice of the determination if such determination is communicated to him verbally or if a letter, form, or other document has been mailed or delivered to him which discloses such determination. The county committee shall notify the producer of its decision in writing within 15 days after receipt of written request for reconsideration. If the producer is dissatisfied with the decision of the county committee, he may, within 15 days after notice of the decision appeal in writing to the State committee. The State committee shall notify him of its decision in writing within 30 days after the submission of the appeal. The decision of the State committee shall be final. If the producer fails to request consideration of a determination by the county committee, or fails to appeal from a decision of the county committee, within the 15-day period, the determination or decision of the county committee shall be final. If the final decision is not made prior to 15 days before the closing date for filing contracts, the producers shall have 15 days following such decision within which to file the contract.

"(b) *Any dispute concerning a question of fact arising under the contract,* except contract violations (which are governed by separate regulations, see § 485.529), *which is not disposed of by agreement, shall be decided by the State committee.* The State committee shall notify the producer in writing that the matter will be considered on a date specified in the notice, which date shall be not less than 30 days subsequent to the date of the notice. If the producer requests such an opportunity within 15 days from

the date of receipt of such notice, he shall be given an opportunity to appear before the county committee and to offer any relevant evidence which he may wish to present. The county committee shall submit a report including its recommendation to the State committee. The producer shall also be afforded an opportunity to be heard by the State committee and to offer evidence in support of his position. If the producer is dissatisfied with the decision of the State committee, he may, within 15 days after notice of the decision is mailed to or otherwise made available to him, appeal in writing to the Deputy Administrator and shall be afforded an opportunity to be heard and to offer evidence in support of his position." (Emphasis supplied.)